**[Cite as *State v. Nicholas*, 2020-Ohio-3478.]**

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## CHAMPAIGN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2018-CA-25 |
| | : | |
| v. | : | Trial Court Case No. 2017-CR-299 |
| | : | |
| DONOVAN ASHER NICHOLAS | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 26th day of June, 2020.

. . . . . . . . . . .

JANE A. NAPIER, Atty. Reg. No. 0061426, Assistant Prosecuting Attorney, Champaign County Prosecutor's Office, Appellate Division, 200 North Main Street, Urbana, Ohio 43078
    Attorney for Plaintiff-Appellee

TIMOTHY B. HACKETT, Atty. Reg. No. 0093480, Assistant State Public Defender, 250 East Broad Street, Suite 1400, Columbus, Ohio 43215
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-Appellant, Donovan Asher Nicholas, appeals from his conviction of one count of aggravated murder, in violation of R.C. 2903.01(A)(F)/2929.02(A). The conviction arose from the murder of Heidi Taylor on April 6, 2017.

{¶ 2} Nicholas was found guilty by a jury of two unclassified felonies, aggravated murder and murder; Nicholas was also found guilty of one- and three-year firearm specifications on both offenses. After the trial court merged the aggravated murder and murder, the State elected to proceed on the aggravated murder. The court then sentenced Nicholas to life with parole eligibility after serving 25 years and to a three-year firearm specification. The firearm specification was to be served consecutively and prior to the sentence for aggravated murder.

{¶ 3} In support of his appeal, Nicholas raises several assignments of error. Nicholas contends that the juvenile court abused its discretion and violated due process by disregarding uncontroverted evidence and transferring this case out of the juvenile court for adult prosecution. Regarding the adult prosecution, Nicholas maintains that the trial court violated his right to be free from cruel and unusual punishment by disregarding his youthfulness and denying his request for an "irresistible impulse" jury instruction related to his plea of not guilty by reason of insanity.

{¶ 4} Also concerning the adult prosecution, Nicholas argues that the trial court denied his right to due process and a fair trial by instructing the jury that an act by someone with multiple personalities is voluntary "so long as * * * the personality then controlling his behavior was conscious and his actions were a product of his own violation." Nicholas additionally contends that he was denied effective assistance of counsel because his counsel presented evidence of his relationship with the victim

without connecting it to Nicholas's mental illness. Finally, Nicholas maintains that the trial court erred by imposing statutorily unauthorized costs.

{¶ 5} After reviewing the records in both the juvenile and trial court cases, we find Nicholas's assignments of error without merit, except for part of one assignment of error pertaining to statutory fees. For the reasons explained below, the judgment of the trial court will be affirmed in part and reversed in part, and this cause will be remanded to the trial court for removal of appointed counsel fees from the cost bill and clarification of two other items of fees assessed.


I.   Facts and Course of Proceedings

{¶ 6} For ease of discussion, we will first discuss the juvenile court proceedings. We will then follow with a recitation of the relevant proceedings in adult court.


A.   Juvenile Court

{¶ 7} On April 7, 2017, Nicholas was charged with delinquency in the Champaign County Court of Common Pleas, Juvenile Division (Case No. 2017 JA 60), for allegedly causing the death of Heidi Taylor on April 6, 2017, in Urbana, Ohio. At the time, Taylor was the live-in girlfriend of Nicholas's father, Noah Shane Nicholas (known as Shane). Nicholas was born on July 9, 2002, and he was 14 years old on the day of the crime.

{¶ 8} According to the statement of Detective Ryan Black of the Champaign County Sheriff's Office (which was attached to the complaints), the Sheriff's Office received a 911 call from Nicholas on April 6, 2017. During the call, Nicholas said that he had killed his "mother." The statement also indicated that Taylor had been stabbed and

shot. Nicholas told responding officers that he had multiple personality disorder and that "Jeff," who was "in his head," had killed Taylor.

{¶ 9} An initial appearance of counsel and detention hearing was held on April 7, 2017, at which time Nicholas denied the charges. The court ordered Nicholas to be placed at the Central Ohio Youth Center ("COYC") pending further proceedings. After Nicholas's counsel moved for a competency evaluation, the court ordered Daniel Hrinko, Psy.D., a doctor of forensic and clinical psychology, to conduct a competency examination. The court also appointed Megan Scott as guardian ad litem ("GAL") for Nicholas.

{¶ 10} On April 14, 2017, the State filed a motion to transfer the matter to the court of common pleas, with a request for a hearing. During a pretrial hearing on April 14, 2017, Nicholas's counsel orally moved for a competency hearing. The court stated that the transfer motion would be held in abeyance until competency was established, and it scheduled a competency hearing for June 15, 2017. Subsequently, Nicholas filed a written motion to evaluate his competency to stand trial.

{¶ 11} After Dr. Hrinko found Nicholas competent to stand trial, Nicholas's counsel filed a "Waiver of Probable Cause Hearing." When the competency hearing was held, the State stipulated to Dr. Hrinko's report and asked the court to find Nicholas competent. Nicholas's counsel, Nicholas, and his father also told the court that they accepted the report as evidence of Nicholas's competence. The court then concluded, based on the statement attached to the complaints, that probable cause existed for the charged offenses of aggravated murder and murder. In addition, the court held that due to the finding of probable cause and Nicholas's age of 14 at the time of the offenses, Nicholas

was eligible for discretionary bindover to the common pleas court. As a result, the court ordered the GAL to conduct a social history and investigation; Dr. Hrinko was also ordered to conduct an amenability evaluation.

{¶ 12} On September 5, 2017, Nicholas's counsel asked the court to order an amenability and treatment evaluation with Dr. Amy Hoisington-Stabile, M.D., of the Ohio State University. According to the motion, Dr. Hrinko's report of May 7, 2017, "concluded that Juvenile is suffering from Dissociative Identity Disorder, but that he is amenable providing he receives proper treatment. However, Hrinko, not being a medical professional, was not able to prescribe or recommend a treatment plan for Juvenile." After finding that Nicholas was seeking treatment rather than another amenability evaluation, the court ordered that Nicholas be transported for evaluation by Dr. Hoisington-Stabile on September 8, 2017. However, on September 11, 2017, Nicholas's counsel filed a motion to reschedule the amenability hearing, stating:

> In addition to other possible witnesses, Donovan [Nicholas] needs to present three (3) expert witnesses at his amenability hearing: (1) Dr. Hrinko to testify as to his amenability; (2) a psychiatrist to testify as to his/her recommended treatment protocol; and, (3) an employee of the Department of Youth Services to testify as to the availability of the recommended treatment protocol. Dr. Hrinko is available, but despite significant effort on counsel's part, we have been unable to obtain a child psychiatrist to treat Donovan.
>
> We have contacted, or attempted to contact, no less than six (6) child

psychiatrists to set an appointment. (See Appendix)[1] * * *

{¶ 13} Per the defense request, the amenability hearing was continued until October 31, 2017. In the meantime, the court denied a motion to transport Nicholas for treatment with a nurse practitioner, concluding that "[d]ue to the severity of this matter, the Court does not feel it is appropriate for a nurse practitioner to make a medication decision."

{¶ 14} At the amenability hearing, the parties stipulated to the admissibility of four exhibits: six factual stipulations (A-1); Dr. Hrinko's psychological evaluation (A-2)[2]; the GAL report (A-3); and the coroner's report on the postmortem examination of Taylor (A-4).

{¶ 15} According to the testimony at the amenability hearing, Nicholas called 911 on April 6, 2017, to report that he had stabbed and shot a person in the head and that she was dead. He identified the person as his mother. On arrival, the police found blood inside the living room, down the hallway into the dining room, inside several

---

[1] The appendix provided, in part, that on August 14, 2017, Donovan's counsel "called The Ohio State University Wexner Medical Center. The[y] declined for lack of insurance (Dr. Hoisington-Stabile)." Motion to Reschedule Amenability Hearing, p. 3. In addition, the appendix stated that "Dr. Hoisington-Stabile's scheduler set an appointment for September 8. * * * Shortly thereafter (about 1:30 pm on September 7), the office of Dr. Hoisington-Stabile called [defense counsel] to say that she wasn't going to take the case."

[2] During the course of the proceedings, the juvenile court noted that it "did some research during lunch and discovered that Revised Code Section 2152.12(F)(4) requires that * * * the amenability evaluation shall – it says, no report on an investigation conducted pursuant to Division C of this section, which is the amenability evaluation, shall include details of the alleged offense as reported by the child. The Court went through the amenability evaluation in detail. And there are details of the alleged offense as reported by Donovan to the evaluator." Transcript of Amenability Hearing ("Amenability Tr."), p. 73-74. In response, Donovan's counsel stated that "[w]e would like the entire report admitted" and "we waive any right to exclude any portion of the report." Id. at p. 74.

surfaces in the kitchen, and on a staircase leading up to the second floor.   Amenability Tr. at p. 35-36.   On the second floor, officers found Taylor's body on a bed in a bedroom. *Id.* at p. 36.   A firearm was located on the bed, and Taylor was missing artificial fingernails, some of which were found on the first floor of the house, which indicated a struggle.   *Id.* at p. 40, 41, 53, and 54.   The police also found a bloody knife on the kitchen table.   *Id.* at p. 44.   The postmortem examination of Taylor revealed 62 to 64 sharp force entry wounds on her body, as well as a gunshot wound to her right frontal scalp.   At least 35 of the sharp-force entries were on Taylor's upper extremities, and she had defensive wounds as well.   *Id.* at p. 61.

{¶ 16} When the police arrived, Nicholas was in the kitchen, with a wound to his leg.   *Id.* at p. 37.   After being taken to the hospital, Nicholas was interviewed by Detective Glenn Kemp of the Champaign County Police Department.   According to Nicholas's account, he returned home from school on April 6 and took a nap.   After awakening, he cleaned his room, and a second personality of his named "Jeff the Killer" emerged.   Jeff was an anime character with whom Nicholas was familiar.   *Id.* at p. 22.[3] Jeff changed clothes, donning a white shirt and black pants, went downstairs to the kitchen and obtained a knife from the knife drawer.   He then went into the bathroom and, using a lancet needle, cut his face upward from the corners of his mouth like an exaggerated smile.[4]   *Id.* at p. 22-23.   After doing that, Jeff took the knife, went to an area adjacent to the stairwell that led to the upstairs of the residence, and waited for Taylor to

---

[3] Because Donovan maintained that Jeff killed Taylor and that he was not responsible, we will refer to him as "Jeff" when referring to Donovan's account of the murder.

[4] This was intended to approximate the appearance of the anime character.

come down.   *Id.* at p. 23.   Taylor was a long-time girlfriend of Nicholas's father, Shane, and lived in the same household with Nicholas, who called her mom.   *Id.*

{¶ 17} When Taylor did not come down quickly enough, Jeff called for her and hid behind a door near the stairway.   *Id.* at p. 23-24.   When Taylor came down and walked past, Jeff exited his hiding place and hugged her from behind.   When Taylor turned around, she questioned the cuts on his face, and Jeff began stabbing her.   Nicholas said he did not know how many times Jeff stabbed Taylor; she was stabbed wherever the knife could penetrate.   *Id.* at p. 25.

{¶ 18} After being stabbed, Taylor asked Jeff to call for help, but he refused. Taylor then tried to go up a back stairway in the kitchen to get her cellphone from the master bedroom.   However, Jeff went up the stairs in front of Taylor, went into the bedroom, and secured the cellphone.   Although Taylor again asked Jeff to call for assistance, he refused.   *Id.* at p. 25.   After Taylor collapsed on the bed, Jeff recalled that a firearm was located in a nightstand.   He then opened the drawer, retrieved the firearm and a loaded magazine, and fired one round, striking Taylor in the head.   *Id.* at p. 25-26.

{¶ 19} Jeff then discarded the firearm on the bed and went downstairs.   During the attack or while Taylor was trying to evade the knife or take control, Jeff had accidentally stabbed himself in the leg.   *Id.* at p. 26.   When he realized this, he called 911 for assistance.   *Id.* at p. 27.

{¶ 20} During the police interview, Nicholas said he had been dealing with the Jeff persona for about three months and that Jeff was homicidal.   However, when Detective Kemp spoke to Nicholas, Nicholas said Taylor was the only person Jeff wanted to harm. *Id.*   According to Nicholas, Taylor had struck him in the back at one point and was mean

to him. *Id.* at p. 27.

**{¶ 21}** During the hearing, the defense presented testimony from Dr. Daniel Hrinko, who did the amenability evaluation, and from Sarah Book, a licensed clinical counselor with a supervisory designation for the State of Ohio and the Acting Chief of Behavioral Health Services at the Ohio Department of Youth Services (ODYS").

**{¶ 22}** Dr. Hrinko, a psychologist in private practice, was asked to evaluate Nicholas "regarding his amenability to rehabilitation in the juvenile justice system as well as his dangerousness to the community." Amenability Tr. at p. 77. Dr. Hrinko testified that Nicholas was raised primarily by his father and Taylor, that his father's work required him to be out of the area often, and that Nicholas "essentially felt alone in the house." *Id.* at p. 80. According to Dr. Hrinko, Nicholas's biological mother was not involved in his life and Nicholas's loneliness resulted in "significant levels of emotional stress," which caused "significant symptoms of mental illness beginning as early as 6th grade in the form of cutting himself." According to Dr. Hrinko, cutting is one of those symptoms of mental illness in late childhood and adolescence that is "a real concern as far as developing significant problems with emotions, moods, and behaviors in life." *Id.*

**{¶ 23}** Dr. Hrinko reported that Nicholas had initially attended West Liberty-Salem School, where he had no significant behavioral problems and enjoyed academics. Nicholas then transferred to Graham Schools, where he felt very isolated because "the school focused heavily on sports and athletics." *Id.* at p. 81. According to Dr. Hrinko, Nicholas "consistently doubted his capabilities, his value of worth, and often expressed suicidal ideation." *Id.* Nicholas also experienced anxiety and depression. *Id.* at p. 81.

**{¶ 24}** In this regard, Dr. Hrinko testified:

There were no medical problems in his history as far as problems that may explain problems. And he had no history of any mental health treatment. Even though there were times when his behaviors were noticed by his family and at school that would be indicators of potential mental health problems, the family chose not to pursue them. Which meant that he had no exposure to any mental health counseling prior to the instant offense. There is no record or indication of him abusing substances. And there is no history of him being involved with the courts prior to this situation.

*Id.* at p. 82.

**{¶ 25}** According to Dr. Hrinko, Nicholas's symptom patterns "suggested a particular disorder for which there is no real scientifically valid well-established well-supported test," namely Dissociative Identity Disorder ("DID"). *Id.* at p. 84. Dr. Hrinko's report stated that the Diagnostic and Statistical Manual, Fifth Edition, describes DID as follows:

A- Disruption of identity characterized by two or more distinct personality states…

B- Recurrent gaps in the recall of everyday events…

C- The symptoms cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.

D- The disturbance is not a normal part of a broadly accepted cultural or religious practice.

E- The symptoms are not attributable to physiological effects of a substance or medical condition.

Amenability Hearing Ex. A-2, Evaluation of Amenability for Rehabilitation, p. 24.

{¶ 26} Dr. Hrinko further stated that DID is "incredibly rare for adolescents." Amenability Tr. at p. 85. After reviewing the police reports, the discovery packet, the records from COYC describing Nicholas's behaviors, and interviewing Nicholas, Dr. Hrinko concluded that Nicholas had "two developing relatively distinct personalities." *Id.* at p. 86. In this regard, Dr. Hrinko explained that "there is Donovan that he refers to as himself. And the other [h]as adopted the name Jeff the Killer." *Id.* According to Dr. Hrinko, "[e]vidence suggests that when Jeff the Killer is in charge, that he behaves differently. When he writes, the style of writing is different. There are use of dot codes for ways of writing. There is also a difference in dress; a particular outfit that Jeff the Killer wears that Donovan, to my knowledge has never worn." *Id.*

{¶ 27} With respect to DID, Dr. Hrinko stated that it is rooted "in an inability to handle stress." *Id.* at p. 87. Individuals who have DID have "a particular group of stressors that they are unable to figure out in an effective way of handling." *Id.* As a result, parts of the person that normally would be integrated take on "the characteristics that the primary person feels incapable of doing." *Id.*

{¶ 28} As that process continues over time, with the alternate personality doing things the primary person cannot, the other personality gains strength and a power struggle occurs. *Id.* at p. 88. "So a person at some situation may become themselves, but in other situations when the stressors trigger this, the other personality emerges, takes charge, and behaves in a manner that the other person wishes they could but feels powerless to do so." *Id.* According to Dr. Hrinko, "initially, it is a good me/bad me. I allow myself to do this. But there comes a point in rare circumstances where the other

side of you develops its own independent identity and you lose control of when or how you do this. And that is when that break occurs into a separate, distinct personality." *Id.* at p. 88-89.

{¶ 29} Dr. Hrinko further testified that around January 2017, "Jeff began to become more independent, more powerful, and Donovan became less independent and less powerful. Creating situations where Jeff would do things and say things. Even referring to Donovan in the third person. Indicating that Jeff is Jeff and Donovan is Donovan inhabiting one physical body but two distinct people." *Id.* at p. 89-90. Concerning potential fabrication, Dr. Hrinko stressed that it was "theoretically possible, but highly unlikely" that Nicholas contrived this scenario. In this vein, Hrinko stated:

> For Donovan to have contrived this to be able to make use of this possibility in a criminal defense situation * * * he would have had to have started this long ago, understood the dynamics and natures [of] how multiple personalities form, how they function, how the symptoms arrive, and to consciously create differences that are recorded in text messages, notebooks, and observations from beginning at least in January prior to the instant offense.

*Id.* at p. 90.

{¶ 30} Concerning a question about the danger of the lack of brakes on the multiple personalities, Dr. Hrinko responded that "if you imagine that the Donovan personality has all the caution, conscious, concerns, and worries about long-term consequences where the Jeff personality is merely anger, violence, revenge, and action, without those other qualities to counterbalance it, then that creates a situation where very violent and very

destructive actions are likely * * *."   *Id.* at p. 91.   At that point, the following exchange occurred:

[Defense Counsel] Q.   So to cure this problem you need to reintegrate?

A.   There is research indicating that extensive psychotherapy, mental health counseling, individual, sometimes groups, focusing on helping the weaker personality develop and adopt many of the qualities of the pathological personality within reason and with counterbalances allows them to then gain the strength to get the other personality to kind of blend in with proper checks and balances.   In other words, take the qualities of Jeff that could be positive, when appropriately used, and integrate that into Donovan.   And research shows that with intensive therapy lasting several years that this can be done.

Q.   Is a three to five-year period reasonable?

A.   The research usually talks about various intensive treatment settings that lasts a minimum of one.   How long it takes to fully integrate depends upon the nature of the program, the individual, and so on and so forth.

Q. * * * Do you have an opinion as to reasonable psychological probability of whether or not Donovan suffers from [DID]?

A.   I have no doubt he suffers from a severe mental illness consistent with [DID].

Q. * * * Is it your opinion that disorder is treatable?

A.   Given his age and the time available with the Court, I believe it is.

Q. And in your report you indicated that you believed that he was amenable to rehabilitation; is that correct?

A. That is correct.

Q. * * * Now, you also stated in your report that he is a danger at present; is that correct?

A. That's correct.

Q. And you believe that if he can undergo the long-term psychotherapy, that he could be reintegrated?

A. If * * * the treatment is able to assist him in reintegrating the Jeff into the Donovan so that it is finally banished into a more assertive, healthy Donovan, then the likelihood of Donovan engaging in the kinds of behaviors that Jeff would, without any kind of counterbalance, goes down dramatically.

Q. And the kind of treatment that he needs is what? A psychologist?

A. Psychologist with a willingness to spend the time necessary to work with him individually to talk about how to reintegrate, to talk about these qualities he believes he doesn't have that was the fertile ground for Jeff to emerge, and to allow him opportunities in a controlled environment to use and practice those skills as Donovan.

Q. And you are talking about something that is more than just once a month?

A. Oh, definitely. Weekly sessions would be wise. Plus the ability to be available so that if he was in an environment where he was having a

conflict with someone and Jeff wanted to punch them and Donovan was able to say, I need to go talk to my doc, and they could get ahold of somebody to talk it through and help Donovan to figure out how to handle this assertively, but without resorting [to] what Jeff would want to do, then he would be able to start removing the power from Jeff; developing his own assertiveness and power and capabilities. And that will be part of that reintegration process.

So the 24/7 supervision and support would allow him real-world assistance at making the better decisions to reintegrate those personalities.

Q. And a place like a long-term youth services facility could provide such treatment if it is available?

A. I believe so. I have to admit my knowledge of the programs of the Department of Youth Services is relatively cursory because they are always evolving. And it is impossible for someone in my position to stay completely up-to-date on every program everywhere and nuances and details.

Amenability Tr. at p. 91-95.

{¶ 31} During cross-examination, Dr. Hrinko testified that "there is clear evidence of Jeff as a separate person" in a set of text messages between Nicholas and his friend, T.D., around March 3-4, 2017. *Id.* at p. 106. While acknowledging that this could be role-playing or fantasy, Dr. Hrinko stressed that documentation other than the texts on March 3 existed. *Id.* In this regard, the following exchange occurred:

[Prosecutor] Q. * * * You mentioned a notebook, I believe, or a

composition book I thought?

A.   Yes.   During one of the text conversations – in fact, I'm looking at it.   On page 15 on March 14, which is a little later, he texts a series of characters.   JK plus CW.   * * * And then DN plus MW.   Which in my understanding, DN being Donovan Nicholas and MW being [M.W.] who is up in Wisconsin.[5]   JK being Jeff the Killer and CW who I have no idea who that is referring to.   And it implies that each personality has its own relationship.

In the notebook somewhere in January, since not every day in the notebook is dated, there are also heart graphics drawn with the same pairings.   So for this to be fabricated and role play, he would have to make a plan to write these things in the notebook on one point in time.   And then at a later point in time text them accordingly in a similar way, which is possible.   But I believe that the existence of separate personalities is a better explanation for that particular set of data.

Amenability Tr. at p. 106-107.

{¶ 32} When asked if the treatment Nicholas required would involve medication, Dr. Hrinko said that medication could reduce the intensity of his symptoms of anxiety and depression, thereby letting him "be more responsive to the psychotherapy," but that there were no medications to treat DID.   *Id.* at p. 110.   According to the doctor, the research "says that with effective treatment the integration can improve, the inappropriate

---

[5] Initials have been inserted in place of the names of Donovan's friends, T.D. and M.W., to protect their identities.

behaviors associated with the alternative personality [go] way down, and that there is reasonable control over the characteristics of the alternative personality so the people function much better and therefore their risk goes down." *Id.* at p. 112. When asked if he could provide certainty that within five years in the juvenile system Nicholas would be able to be reintegrated into society, Dr. Hrinko responded, "I can't give you any certainty. I can give you a reasonable professional judgment that I believe it is possible and likely." *Id.* at p. 116-117.

{¶ 33} Dr. Hrinko acknowledged that there is "no single study dealing with this particular situation. With [DID] in general, and in other populations who suffer from it, the research, in my opinion, consistently says this kind of treatment helps immensely." *Id.* at p. 117. The doctor further testified that most "treatment programs * * * are either residential-type inpatient programs that typically rarely last more than a year or lengthy outpatient programs that last seven, eight, nine, ten years." *Id.* Dr. Hrinko could not say "if a four-year program would be good," because he had "no information regarding the effectiveness of a four-year program." *Id.* at p. 118. However, because a one-year program "does seem to be helpful," he concluded that "it would be reasonable to determine that five years would also be helpful." *Id.* The doctor added that during Nicholas's COYC stay, Nicholas had "no history of any involvement with any treatment of any kind other than being stabilized at the [COYC] to making [sic] sure that he's not a danger to himself or others in that environment at that time." *Id.* at p. 122.

{¶ 34} In response to a question by the court, Dr. Hrinko testified that if Nicholas participated "in treatment that is consistent with what the research suggests is effective and is able to reintegrate Jeff into himself to where Jeff no longer existed, the odds of

Donovan re-offending would be approximately the same as most other people his age walking the street." *Id.* at p. 127. However, if Nicholas were not able to reintegrate Jeff, "then the research suggests that Jeff will gain further power, further control more often, and that bad things will happen." *Id.* at p. 128.

{¶ 35} Notably, Dr. Hrinko said:

* * * Dissociative Identity Disorder is usually diagnosed in the 20's. And it often involves inappropriate behaviors, but rarely behaviors of this violence even in adults. And within adolescents it is even more rare. So, even though I don't have a specific article that supports that adolescents with Dissociative Identity Disorder who perpetrate these crimes can be treated[,] the research gives me the opinion that individuals with Dissociative Identity Disorder who behave badly can be treated and, therefore, reduce their risk of violence. So that's what I'm basing my opinion on is that general theme. Without specific hardcore evidence because this, in this case, is so rare.

*Id.* at p. 98. Moreover, Dr. Hrinko acknowledged that he was unable to cite "a single article or a single specific case where treatment has been documented to be successful involving homicidal behavior." *Id.* at p. 99.

{¶ 36} Sarah Book was the Acting Chief of Behavioral Health Services at ODYS. Book indicated that Ohio has three long-term facilities for juveniles who have been adjudicated delinquent for the commission of serious felonies. She stated that "Each facility has a licensed psychologist on staff. They provide assessments and screenings and a variety of site testing. And they also provide intervention in terms of individual and

group therapy." *Id.* at p. 142. In addition, each facility contracts with a psychiatrist, who provides onsite services. *Id.* According to Book, if juveniles are assessed to need psychiatric and psychological services, they will receive them. *Id.*

{¶ 37} During cross-examination, Book stated that she was aware that Nicholas was diagnosed with DID, and that "psychiatric services and potentially individual treatment" had been recommended. *Id.* at p. 144. However, Book indicated that she had no experience with DID during her professional career. *Id.* at p. 145. The following exchange then occurred:

> [Prosecutor] Q. Does anyone at your facility have any experience, to the best of your knowledge, with dealing with anyone dealing or diagnosed with [DID]?
>
> A. I don't know that.
>
> Q. Do you have anyone in any of the three facilities, Massillon, Cuyahoga, or Circleville, who are currently a resident within the facility that have been identified with [DID]?
>
> A. I attempted to run a report to see if we had. We have some limitations with our data when we transitioned about three years ago from paper to electronic. So there was only a three-year window I was able to access. And per my query, I was not able to find that.

Amenability Tr. at p. 146.

{¶ 38} When asked what steps ODYS would take to treat a resident with DID, Book responded:

> It would be the same as any individual that would come through our

doors who has a past diagnosis or current diagnosis of mental illness. They would receive and [we] would be required * * * by our accreditation standards to provide a mental health appraisal or diagnostic assessment within 14 days of their admission. So there would be a number of tools, tests, and assessments that would be done. Screening that would be done within the first couple of weeks of their admission. Based on those recommendations and in combination with anything that the county would recommend or anything that was mandated would be included upon their treatment plan.

*Id.* at p. 146-147.

{¶ 39} Concerning treatment, the following exchange also occurred between Book and the prosecutor:

Q. Well, then as it relates to Mr. Nicholas in his current situation, that is my concern. If he's sent to you, and he's diagnosed with [DID], we've just established that you have no treatment placed specific to that disorder because you've never dealt with it. * * *

So if the Court were to order you to follow a treatment plan specific to [DID], as it stands today, you don't have any ability or means or know or any experience to address someone with those issues, do you?

A. I think I would need to know what those treatment recommendations were in order to answer that.

* * *

Q. So if someone were presented to [ODYS] as a resident of one

of the facilities and they were the only person in the State of Ohio that is diagnosed with [DID], it would be difficult to provide group psychotherapy to that person, wouldn't it?

> A. No, it wouldn't.

> Q. How would that be accomplished?

> A. * * * I think there are probably ancillary issues or co-occurring issues that could be addressed.

*Id.* at p. 148-150.

**{¶ 40}** Book further testified that "an assessment is a complex thing. It includes a clinical interview. A diagnostic interview where you're assessing the person in front of you and their mental status. It also includes reports and information and past psychosis and school records and screening tools." She stated that there are "a battery of different things that create a case that should capture the needs at hand. Then you would build your plan based on that." *Id.* at p. 151-152.

**{¶ 41}** The trial court had additional questions, as evidenced by the following exchange:

> THE COURT: * * * Those three facilities you are referring to * * * Those are only for young men, is that correct?

> THE WITNESS: Correct.

> * * *

> THE COURT: Okay. How many young men are in each facility?

> * * *

> THE WITNESS: I'll have to give you kind of approximations

because that can change on a daily basis. We have a daily average population of about 450.

THE COURT: In each?

THE WITNESS: No. Total across three facilities. They all sort of fluctuate between 140 to 150.

* * *

THE COURT: And you said you have psychologists on staff?

THE WITNESS: We do have psychologists on staff, yes, at each facility.

THE COURT: One for each facility?

THE WITNESS: No. We have a psychology supervisor who ultimately is at the top of the table of organization in terms of the behavioral health team within the facility. We have a number of psych assistants who work underneath that person's license and they do testing.

THE COURT: How many psychologists do you have at each facility?

THE WITNESS: * * * Licensed?

THE COURT: Yes, licensed psychologists.

THE WITNESS: So at the Hills we have three. At Indian River in Massillon we currently have two. And at Circleville we currently have two licensed and one psych assistant. So again, they are operating underneath the licenses of one of the licensed individuals.

THE COURT: And do they – what kind of hours do they work? I

mean, do they work like a regular week?   A regular day?

THE WITNESS:   * * * The psychologist in particular?

THE COURT:   Yes.

THE WITNESS:   * * * They generally work a Monday through Friday. Although, they do have the ability to work on weekends.   Each facility sort of has their own schedule.   Which may include partial weekend.   Partial nights.   We change that sometimes to meet the needs that we have.

THE COURT:   If I told you that the diagnosing provider said that this young man would need 24/7 supervision and support from a psychologist, would you be able to provide that?

THE WITNESS:   What does that mean?

THE COURT:   24 hours a day, 7 days a week.

THE WITNESS:   Meaning, that they are face-to-face with a psychologist?

THE COURT:   Any time that the alternate personality came out they would be able to meet with their psychologist?

THE WITNESS:   You know, generally, we have instances where young people will have potentially suicidal ideations and things like that and it may happen in the weekend or nighttime.   The current policy and procedure that we have for that right now is that the psychology supervisor would be called.   If they were not there, they would provide some consultation.   We do have the ability to have other licensed folks do the risk assessment for that. * * *

THE COURT:   This isn't suicidal ideations.

THE WITNESS:   I understand.   I'm trying to liken it to a particular process.   I can't say we would have an on-call person available to him 24/7.

* * *

THE COURT:   * * * Are you familiar with our court at all? Champaign County Juvenile Court?

THE WITNESS:   I am not.

THE COURT:   Would it surprise you to know that the Ohio Department of Youth Services has ignored Court orders from this Court in the past?

* * *

THE WITNESS:   It would.   It wouldn't be my understanding that that is our typical way of handling a Court order.

Amenability Tr. at p. 156-160.

{¶ 42} At the conclusion of the testimony, the GAL advised the Court that her recommendation, as reflected in her report, remained the same, i.e., "it is in Donovan's best interests for his case to remain in the Juvenile Court."   In the report, the GAL based her recommendation on the two evaluations of Dr. Hrinko (competency and amenability) as well as her own interactions with Nicholas.   *See* Amenability Hearing Ex. A-3, p, 7.

{¶ 43} After the hearing, the juvenile court issued an "Entry on Amenability Hearing," which provided, in pertinent part:

In support of its Motion to Transfer Jurisdiction to Common Pleas Court for trial as an Adult, * * * the State presented the testimony of

Dispatcher Caitlin Lockard, Detective Glenn Kemp and Detective Josh Welty.[6]   The State also submitted Exhibits 1- 26, which were admitted over the juvenile's general objection regarding their relevance.[7]   In addition, the State filed on November 13, 2017, a written Memorandum in Support of its position.

The juvenile presented the testimony of Dr. Daniel Hrinko, [T.D.], and Sarah Book * * *.   He also submitted Exhibit A,[8] which was admitted without objection.   The juvenile had previously filed on October 26, 2017, a Memorandum in Opposition to the State's Motion for Transfer.

In consideration of all testimony and evidence presented and taking into consideration R.C. 2152.12(D) & (E), the Court finds the following:

- The victim of the act charged suffered physical and psychological harm as a result of the alleged act;

- The juvenile's relationship with the victim facilitated the act charged;

- The juvenile had a firearm on or about his person or under his control at the time of the act charged and the juvenile used the firearm during the commission of the act charged;

- The juvenile has a mental illness – most likely [DID];

- The juvenile was the principal actor in the act charged and was not

---

[6] Welty responded to Donovan's home after the homicide.

[7] These exhibits included the 911 call, photos from the crime scene, and photos of the victim.

[8] Exhibit A was a separate copy of Dr. Hrinko's report, which included underlining of the text and handwritten notations.

under the influence or coercion of another;

- The juvenile appears to be highly intelligent as indicated in Dr. Hrinko's Amenability Evaluation, as well as Dr. Hrinko's Competency to Stand Trial Evaluation;

- The juvenile was calm and for the most part without emotion throughout all of the proceedings. He presented well to the Court with a level of maturity that belies the circumstances of this matter;

- This Court can maintain jurisdiction over the juvenile for the next six (6) years;

- ODYS does not have the resources or capability of treating [DID], which requires a long-term intensive treatment plan that may require 24 hours/7-day supervision and support for the juvenile; and

- If the juvenile is not treated completely successfully, it is very likely that he will commit offenses against other individuals, and therefore, he does pose a significant danger to society.

Balancing these findings, the Court finds that factors favoring transfer outweigh the factors against a transfer. In particular, the Court finds that because ODYS cannot offer the specific treatment necessary to rehabilitate the juvenile, the juvenile system cannot provide a reasonable assurance of public safety.

Entry on Amenability Hearing, p. 2-3.

{¶ 44} The court, therefore, granted the State's motion to transfer. Subsequently, on November 28, 2017, the court ordered that Nicholas be held without bail at the COYC,

pursuant to R.C. 2152.26.

## B. Adult Court

{¶ 45} On December 15, 2017, an indictment was filed in the General Division of the Champaign County Court of Common Pleas (adult court) charging Nicholas with aggravated murder and murder. Each count carried two firearm specifications, a one-year and a three-year specification. The case was docketed as Champaign C.P. No. 2017-CR-299. After Nicholas was arraigned on those charges, the court found him indigent and appointed counsel. The appointed counsel was the attorney who had previously represented Nicholas in the juvenile court proceedings. Nicholas entered a plea of not guilty by reason of insanity. The court also referred Nicholas to the Forensic Psychiatry Center for Western Ohio for a determination of his mental condition at the time of the offense.

{¶ 46} In addition, the trial court granted Nicholas's request for appointment of another expert witness, Benjamin Hendrickson, Psy.D, for an evaluation of Nicholas's condition at the time of the offense. After both evaluations returned results unfavorable to Nicholas, his counsel asked the trial court on March 21, 2018, to appoint Dr. Hrinko to conduct a third sanity evaluation. On March 28, 2018, the trial court denied the motion, concluding that R.C. 2945.371 did not impose a statutory requirement for a second recommendation for a defense forensic examiner. *See* Entry Denying Motion for Second Forensic Examiner, p. 2-3.[9] At the hearing, Nicholas's attorney stated that Nicholas

---

[9] The docket references in this part of our opinion refer to the docket in Champaign C.P. No. 2017-CR-299.

would consider whether he could afford to hire a second forensic examiner. In that event, the court said it would consider continuing the trial if Nicholas indicated his intention to hire a second examiner. *Id.* at p. 4-5. Shortly thereafter, Nicholas indicated he had arranged to obtain an independent psychologist, and the court then continued the trial to July 16, 2018. *See* Motion for Continuance (Apr. 2, 2018) and Entry Granting Motion for Continuance (Apr. 4, 2018).

**{¶ 47}** Prior to trial, on July 11, 2018, the court held a hearing on Nicholas's motion to permit non-expert insanity testimony and on the State's motion in limine to preclude evidence and/or testimony concerning diminished capacity and the defense of not guilty by reason of insanity. The court heard testimony from Dr. Hrinko and Nicholas. After considering these matters, the court ruled that Nicholas had presented sufficient evidence of a factual question for the jury to decide whether he suffered from a mental disease or defect, but had not presented sufficient evidence "for the Court to conclude that the Defendant has a question of fact for the jury to decide whether at the time of the commission of the homicidal incident, the Defendant did not know, as a result of the severe mental disease or defect, the wrongfulness of his acts." Doc. #129, p. 13. In addition, the court rejected Nicholas's proposed evidence that he was acting under an irresistible impulse or under partial diminished capacity. *Id.* The court, therefore, rejected expert testimony on Nicholas's "diminished capacity" and granted the State's motion in limine. *Id.* at p. 13-14.

**{¶ 48}** Following a jury trial, the jury found Nicholas guilty of all offenses and specifications as charged. During the sentencing hearing, the court merged the aggravated murder and murder charges, and the State elected sentencing on the

aggravated murder charge. The trial court then sentenced Nicholas to life in prison with parole eligibility after 25 years on the aggravated murder charge, and three years on the gun specification, which was to be served consecutive to and prior to the 25-year sentence. This timely appeal followed.

## II. Discretionary Bindover

{¶ 49} Nicholas's First Assignment of Error relates to the transfer of his case from juvenile court, and states that:

> The Juvenile Court Abused Its Discretion and Violated [Nicholas's]
>
> Right to Due Process of Law When It Disregarded Uncontroverted Evidence
>
> and Transferred This Case for Criminal Prosecution.

{¶ 50} Under this assignment of error, Nicholas makes several arguments. The first is that the trial court abused its discretion by arbitrarily disregarding Dr. Hrinko's expert conclusions. According to Nicholas, Dr. Hrinko provided unequivocal testimony that Nicholas was amenable to treatment in the juvenile system, and the State provided no rebuttal testimony or other opinions to the contrary.

{¶ 51} Because Nicholas was 14 years old at the time of his offense and did not fall within any of the mandatory transfer provisions in R.C. 2152.10(A)(1)-(3), his transfer was discretionary pursuant to R.C. 2152.10(B). In such situations, juvenile courts are required to follow the procedures outlined in R.C. 2152.12. The applicable subsection that applies here is R.C. 2152.12(B), which states:

> Except as provided in division (A) of this section, after a complaint
>
> has been filed alleging that a child is a delinquent child for committing an

act that would be a felony if committed by an adult, the juvenile court at a hearing may transfer the case if the court finds all of the following:

(1) The child was fourteen years of age or older at the time of the act charged.

(2) There is probable cause to believe that the child committed the act charged.

(3) The child is not amenable to care or rehabilitation within the juvenile system, and the safety of the community may require that the child be subject to adult sanctions. In making its decision under this division, the court shall consider whether the applicable factors under division (D) of this section indicating that the case should be transferred outweigh the applicable factors under division (E) of this section indicating that the case should not be transferred. The record shall indicate the specific factors that were applicable and that the court weighed.

{¶ 52} The first two requirements are not in question here, as both Nicholas's age and probable cause were readily established. The third requirement, lack of amenability for treatment in the juvenile system, was at issue. With respect to lack of amenability, R.C. 2152.12(D) provides:

In considering whether to transfer a child under division (B) of this section, the juvenile court shall consider the following relevant factors, and any other relevant factors, in favor of a transfer under that division:

(1) The victim of the act charged suffered physical or psychological harm, or serious economic harm, as a result of the alleged act.

(2) The physical or psychological harm suffered by the victim due to the alleged act of the child was exacerbated because of the physical or psychological vulnerability or the age of the victim.

(3) The child's relationship with the victim facilitated the act charged.

(4) The child allegedly committed the act charged for hire or as a part of a gang or other organized criminal activity.

(5) The child had a firearm on or about the child's person or under the child's control at the time of the act charged, the act charged is not a violation of section 2923.12 of the Revised Code, and the child, during the commission of the act charged, allegedly used or displayed the firearm, brandished the firearm, or indicated that the child possessed a firearm.

(6) At the time of the act charged, the child was awaiting adjudication or disposition as a delinquent child, was under a community control sanction, or was on parole for a prior delinquent child adjudication or conviction.

(7) The results of any previous juvenile sanctions and programs indicate that rehabilitation of the child will not occur in the juvenile system.

(8) The child is emotionally, physically, or psychologically mature enough for the transfer.

(9) There is not sufficient time to rehabilitate the child within the juvenile system.

{¶ 53} In this case, the juvenile court concluded that factors (1), (3), (5), (8), and (9) favored transfer.   Concerning the factors weighing against transfer, R.C. 2152.12(E)

includes the following matters, as well as any other factors weighing against transfer:

(1) The victim induced or facilitated the act charged.

(2) The child acted under provocation in allegedly committing the act charged.

(3) The child was not the principal actor in the act charged, or, at the time of the act charged, the child was under the negative influence or coercion of another person.

(4) The child did not cause physical harm to any person or property, or have reasonable cause to believe that harm of that nature would occur, in allegedly committing the act charged.

(5) The child previously has not been adjudicated a delinquent child.

(6) The child is not emotionally, physically, or psychologically mature enough for the transfer.

(7) The child has a mental illness or intellectual disability.

(8) There is sufficient time to rehabilitate the child within the juvenile system and the level of security available in the juvenile system provides a reasonable assurance of public safety.

**{¶ 54}** The only factors the court found against transfer were (5) and (7).

**{¶ 55}** As noted, Nicholas's assignment of error alleges both a due process violation and abuse of discretion by the juvenile court. "Due-process rights are applicable to juveniles through the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution." *State v. Aalim,* 150 Ohio St.3d 489, 2017-Ohio-2956, 83 N.E.3d 883, ¶ 23. "Regardless of the

limited scope of bindover proceedings, the Supreme Court of the United States has held that the bindover hearing is a 'critically important proceeding' and that the hearing 'must measure up to the essentials of due process and fair treatment.' "  *In re D.M.*, 140 Ohio St.3d 309, 2014-Ohio-3628, 18 N.E.3d 404, ¶ 11, quoting *Kent v. United States*, 383 U.S. 541, 562, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966).   (Other citation omitted.)

{¶ 56} "For purposes of bindover from juvenile court to adult court, * * * due process is satisfied when a juvenile court issues a decision stating its reasons for the transfer after conducting a hearing at which the juvenile is represented by counsel."  *Aalim* at ¶ 24, citing *Kent* at 544.   In view of this point, Nicholas received due process.   The issue is whether the trial court abused its discretion.

{¶ 57} We review juvenile court decisions on "a child's amenability to rehabilitation in the juvenile system" for abuse of discretion.   *In re M.P.*, 124 Ohio St.3d 445, 2010-Ohio-599, 923 N.E.2d 584, ¶ 14.   An abuse of discretion is "an attitude that is unreasonable, arbitrary or unconscionable."   *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).   We have frequently said that "most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary."   *Id.* Furthermore, decisions are unreasonable if they are unsupported by a sound reasoning process.   "It is not enough that the reviewing court, were it deciding the issue de novo, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result."   *Id.*

{¶ 58} After reviewing the juvenile court record, we find no abuse of discretion. The trial court considered the appropriate statutory factors, and some rational and factual

basis existed in the record to support the court's findings regarding those factors. *State v. Howard*, 2d Dist. Montgomery No. 17298, 2018-Ohio-1863, ¶ 15-16. *See also State v. Hoskins*, 2d Dist. Montgomery Nos. 27486 and 27487, 2018-Ohio-4529, ¶ 17.

{¶ 59} In this case, the juvenile court conducted a full amenability hearing in a discretionary bindover proceeding. The court considered the stated relevant factors in R.C. 2152.12(B) and others and determined that Nicholas was not amenable to treatment for the reasons mentioned above. The dispute, as noted, related to the finding that ODYS did not have the resources or capability of treating DID, which requires a long-term intensive treatment plan that may require 24 hour/7-day supervision and support for the juvenile. There was a rational basis to support this finding. Specifically, the evidence on this issue was vague, variable and, somewhat conflicting.

{¶ 60} At the amenability hearing, Nicholas called psychologist Dr. Hrinko to testify. Dr. Hrinko believed that Nicholas suffered from DID and expressed the opinion that Nicholas was amenable to rehabilitation. Amenability Tr. at p. 92-93. However, this conclusion and the likelihood of successful treatment were subject to many limitations, variables, and conditions that the trial court was allowed to consider in weighing the testimony.

{¶ 61} As a preliminary point, Dr. Hrinko's conclusions were based solely on research, not on his experience with treating DID. In this regard, Dr. Hrinko testified that "I have been investigating some articles that talk about models of treatment that **can** prove helpful and successful in dealing with Dissociative Identity Disorder." (Emphasis added.) *Id.* at p. 95. According to Dr. Hrinko, DID is usually diagnosed in a person's mid-20s and beyond. Notably, DID is "incredibly rare for adolescents." *Id.* at p. 85. Cases of DID

involving behaviors of the type of violence involved in Nicholas's case are also rare, and within adolescents, even more rare. *Id.* at p. 98. Significantly, Dr. Hrinko did not recall finding one study or case wherein treatment had been documented to be successful involving populations of people with DID who had committed homicide. *Id.* at p. 96-97, and 98-99.

{¶ 62} Dr. Hrinko further testified that "[h]ow long it takes to fully integrate [the personalities] depends on the nature of the program, the individual, and so on and so forth." *Id.* at p. 92. He went on to explain that the kind of treatment Nicholas needed was a psychologist "with the willingness to spend the time necessary to work with him individually to talk about how to reintegrate, to talk about these qualities he believes he doesn't have that was the fertile ground for Jeff to emerge, and to allow him opportunities in a controlled environment to use and practice those skills as Donovan." *Id.* at p. 93-94. After making this statement, Dr. Hrinko then said:

Weekly sessions would be wise. Plus the ability to be available so that if he was in an environment where he was having a conflict with someone and Jeff wanted to punch them and Donovan was able to say, I need to go talk to my doc, and they could get ahold of somebody to talk it through and help Donovan to figure out how to handle this assertively, but without resorting [to] what Jeff would want to do, then he would be able to start removing the power from Jeff; developing his own assertiveness and power and capabilities. And that will be part of the reintegration process.

So the 24/7 supervision and support would allow him real-world assistance at making the better decisions to reintegrate those personalities.

*Id.* at p. 94.

**{¶ 63}** During the amenability hearing, this exchange also occurred between the prosecutor and Dr. Hrinko:

Q. You acknowledge - and when you say that Mr. Nicholas currently poses a significant hazard to the safety of the community, recognition of that hazard, in part, is based upon the harm he has already done to the victim in this case?

A. It is also based on the fact that Jeff had intentions of harming others in the school. And that if he had not perpetrated this particular act, as Jeff gained power, it is highly likely he would perpetrate other acts against other individuals that he felt were deserving that kind of attention.

So his dangerousness to the community is not only based on what he did but what Jeff was talking about doing at other times to other people.

Q. And so the concern I have is how you can make the conclusion or come to the conclusion, where I'm struggling with, is how you can come to the conclusion that he is amenable to treatment at the juvenile level when you can't cite a single article that deals with that level of violent behavior or that addresses a successful treatment involving someone who dealt with those violent propensities?

*Id.* at p. 97- 98.

**{¶ 64}** Dr. Hrinko explained that 24/7 supervision and support would allow Donovan real-world assistance in making better decisions to reintegrate his personalities. Furthermore, the prospects for successful treatment were critical in the amenability

analysis. In this vein, Dr. Hrinko testified that "[i]f Donovan is not able to reintegrate Jeff then research suggests that Jeff will gain further power, further control more often and bad things will happen." *Id.* at p. 128.

{¶ 65} Sara Book, the Acting Chief of Behavioral Health Services for ODYS, testified about the treatment capabilities of ODYS. According to Book, each facility had full-time professional staff working during normal daytime work hours and professionals on call should an emergency arise after hours. Book also testified that ODYS contracts with psychiatrists and psychologists as needed. *Id.* at p. 142-143 and 158-159. If a youth is deemed to need a particular service, ODYS would connect them with the service they need. *Id.* at p. 143.

{¶ 66} Psychotherapy could be provided by a state licensed psychologist, counselor, social worker, or marriage and family therapist. *Id.* at p 149. In addition, ODYS would perform its own assessment of Nicholas and provide a treatment plan based on that. *Id.* at p. 151-152. Book also testified that while ODYS would perform its own assessment, it would consider all things, including the court's recommendations. *Id.* at p. 155-156.

{¶ 67} Based on the preceding discussion, the evidence concerning ODYS's capability to successfully treat Nicholas was vague, was sometimes conflicting, and was variable. The juvenile court would not have acted unreasonably in viewing the totality of Dr. Hrinko's testimony about amenability as tenuous. This is particularly true given the vague capabilities of ODYS to successfully treat a very rare adolescent, extremely violent homicidal DID, and the significant danger Nicholas would present to society if he were not successfully treated. Under established authority, the juvenile court was free to

disregard any part of the testimony of Dr. Hrinko and Book, or to assign any weight it deemed appropriate. *State v. Easley*, 10th Dist. Franklin Nos. 16AP-9, 16AP-10, 2016-Ohio-7271, ¶ 15, citing *State v. Reeder*, 2016-Ohio-212, 57 N.E.3d 458, ¶ 24 (10th Dist.). (Other citations omitted.)

**{¶ 68}** As indicated above, the reasoning and underlying bases of Dr. Hrinko's opinions regarding amenability were rife with limitations, variables, and conditions. When considered along with ODYS's treatment capabilities, the likelihood of successful treatment, and Nicholas's propensity for violence if not successfully treated, the juvenile court did not abuse its discretion in making the difficult determination to transfer the case. This is particularly true in view of the wide latitude that juvenile courts have on this issue. *See State v. Watson*, 47 Ohio St.3d 93, 95, 547 N.E.2d 1181 (1989); *State v. McCrary*, 7th Dist. Mahoning No. 12 MA 135, 2014-Ohio-1468, ¶ 18.

**{¶ 69}** In this regard, we note that the juvenile judge specifically asked the ODYS representative, Book, whether ODYS would be able to support 24/7 supervision and support from a psychologist; Book replied that she could not "say we would have an on-call person available to him 24/7." Amenability Tr. at p. 158-159. During her questioning, the juvenile judge also expressed concern about the fact that ODYS had ignored court orders in the past. *Id.* at p. 160.

**{¶ 70}** In her findings, the juvenile judge properly considered the violent nature of the crime and the significant danger that Nicholas presented to society. *Watson* at 95-96; *State v. Lopez*, 112 Ohio App.3d 659, 662, N.E.2d 1155 (9th Dist.1996). We have stressed the repeated recognition of Ohio courts " 'that "[t]he more serious the offense, the less amenable the juvenile will be to rehabilitation in the juvenile system." ' " *State*

*v. Howard*, 2d Dist. Montgomery No. 27198, 2018-Ohio-1863, ¶ 33, quoting *State v. Johnson*, 2015-Ohio-96, 27 N.E.3d 9, ¶ 43 (8th Dist.), quoting. *Lopez.*[10]

{¶ 71} As noted, discretionary transfer proceedings from the juvenile court to the general division of the common pleas court are reviewed for an abuse of discretion. " 'A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary.' " *State v. D.H.*, 2d Dist. Montgomery No. 26383, 2015-Ohio-3259, ¶ 11, quoting *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34. "Under this standard, a juvenile court ' "enjoys wide latitude to retain or to relinquish jurisdiction." ' " *Howard* at ¶ 15, quoting *Johnson* at ¶ 36. (Other citations omitted.) " 'As long as the court considers the appropriate statutory factors and there is some rational basis in the record to support the court's findings when applying those factors, we cannot conclude that the trial court abused its discretion in deciding whether to transfer jurisdiction.' " *Id.*, quoting *State v. West*, 167 Ohio App.3d 598, 2006-Ohio-3518, 856 N.E.2d 285, ¶ 10 (4th Dist.). (Other citations omitted.)

{¶ 72} In *Howard* we also stressed that:

"[T]he test is not whether we would have reached the same result upon the evidence before the juvenile court; the test is whether the juvenile court abused the discretion confided in it." * * * "If there is some rational and

---

[10] These cases all relied on *Watson*, which was based on the factors in Juv.R. 30 as it then existed. Juv.R. 30 was subsequently amended to remove all provisions that govern substantive law, due to conflicts with laws relating to bindover proceedings. *See* Staff Notes to the 1997 revision of Juv.R. 30. Nonetheless, *Watson* is still pertinent for the idea that considering the seriousness of a juvenile's crime is appropriate. As noted, juveniles will be less amenable to rehabilitation in the juvenile system where their offenses are more serious. *See also State v. Erwin*, 10th Dist. Franklin No. 09AP-918, 2012-Ohio-776, ¶ 11 (observing that even though a crime's seriousness is no longer a specific factor, R.C. 2151.12(D)(1) and (5) do address the seriousness of the juvenile's crime).

factual basis to support the [juvenile] court's decision, we are duty bound to affirm it regardless of our personal views of the evidence." * * * "After all, the juvenile court judge is personally familiar with both the juvenile system and the individual juvenile and is therefore in a superior position to make a determination whether the juvenile is amenable to care or rehabilitation within the juvenile system."

*Id.,* at ¶ 16.

**{¶ 73}** While Nicholas argues that no evidence supported the court's decision, we simply disagree. For the reasons previously discussed, we also disagree with Nicholas's contention that the court disregarded Dr. Hrinko's expert testimony and also improperly drew inferences about amenability with no basis in the record. Instead, the juvenile court considered the appropriate statutory factors and there is some rational and factual basis in the record to support the court's findings with respect to those factors. The court, therefore, did not abuse its discretion by deciding to transfer jurisdiction.

**{¶ 74}** In his final argument, Nicholas contends that the juvenile court misperceived the scope of its authority and the flexibility inherent in the juvenile system by failing to consider other options, like a serious youth offender ("SYO") designation. In fact, Nicholas argues that a traditional minimum commitment was not appropriate and that a blended sentence would have been the most obvious solution.

**{¶ 75}** R.C. 2152.02(W) defines a serious youthful offender as "a person who is eligible for a mandatory SYO or discretionary SYO but who is not transferred to adult court under a mandatory or discretionary transfer and also includes, for purposes of imposition of a mandatory serious youthful dispositional sentence under section 2152.13

of the Revised Code, a person upon whom a juvenile court is required to impose such a sentence under division (B)(3) of section 2152.121 of the Revised Code."

{¶ 76} As a preliminary matter, Nicholas does not fit within this definition, as his case was, in fact, transferred to adult court. Under R.C. 2152.10(B), if the court chooses not to transfer a child to adult court and adjudicates the child delinquent, the court is required to issue a dispositional order in accordance with R.C. 2152.11. If the case had not been transferred, Nicholas would have been eligible for mandatory SYO under R.C. 2152.11(B)(1); he would not have been eligible for "[t]raditional juvenile" disposition. R.C. 2152.11(B)(3). In this situation, the court would have imposed the available adult court sentence, as well as a traditional juvenile disposition, but would have stayed the adult sentence pending successful completion of the juvenile disposition. *See* R.C. 2152.13(D)(1)(a)-(c).

{¶ 77} The fact that Nicholas would have been eligible for SYO disposition does not mean that the court was required to take this into consideration before deciding amenability. To the contrary, this disposition is not available unless the court has elected not to transfer the child. The juvenile court would have been aware of this fact. And finally, as the State notes in its brief, in situations like the present, "a juvenile court may impose a serious youthful offender dispositional sentence on a child only if the prosecuting attorney of the county in which the delinquent act allegedly occurred initiates the process against the child in accordance with" R.C. 2152.13. *See* R.C. 2152.13(A).

{¶ 78} Accordingly, Nicholas's argument concerning the options the juvenile court "should" have considered is not well-taken. Thus, having rejected all of Nicholas's contentions, and having found no abuse of discretion, the First Assignment of Error is

overruled.

### III.   Irresistible Impulse Instruction

{¶ 79} The remaining assignments of error relate to Nicholas's trial in adult court. In this vein, Nicholas's Second Assignment of Error states that:

> The Trial Court Violated [Nicholas's] Right to Be Free From Cruel
> and Unusual Punishment By Disregarding His Youthfulness and Denying
> His "Irresistible Impulse" Insanity Jury Instruction.

{¶ 80} Under this assignment of error, Nicholas contends that the trial court should have allowed him to insert a different insanity test than R.C. 2901.01(A)(14) provides. According to Nicholas, the court should have allowed an irresistible impulse instruction for three main reasons:   (1) denying an affirmative defense of insanity to severely mentally ill children who act on irresistible impulse does not fit retributive goals; (2) similarly, denial of the defense in such situations does not deter crime; and (3) denial likewise does not further the penological goals of incapacitation and rehabilitation.

{¶ 81} As noted, Nicholas pled guilty by reason of insanity, but none of the experts found him legally insane because he was able to appreciate the wrongfulness of the act at the time of the murder.   As a result, Nicholas filed a motion for revised insanity instructions, based on the irresistible impulse instruction that was previously allowed but is no longer permitted in Ohio.   *See* Defendant's Motion K for Revised Insanity Instructions (June 18, 2018), referring to *State v. Wilcox*, 70 Ohio St.2d 182, 436 N.E.2d 523 (1982).   After holding a pretrial admissibility hearing, the court denied the motion based on the fact that Ohio does not recognize such a defense.   *See* Entry Denying

Defendant's Motion K for Revised Insanity Instructions (July 9, 2018).

{¶ 82} Currently, R.C. 2901.01(A)(14) provides that "[a] person is 'not guilty by reason of insanity' relative to a charge of an offense only if the person proves, in the manner specified in section 2901.05 of the Revised Code, that at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts."[11]  Regarding a not guilty plea by reason of insanity, R.C. 2945.391 states that "[p]roof that a person's reason, at the time of the commission of an offense, was so impaired that the person did not have the ability to refrain from doing the person's act or acts, does not constitute a defense."

{¶ 83} At one time, Ohio did allow what is known as an irresistible impulse defense. However, in 1990, R.C. 2901.01(A)(14) was amended and R.C. 2945.391 was enacted to modify and narrow the law relative to the defense of not guilty by reason of insanity. *See* S.B. 24, 1990 Ohio Laws File 225.

{¶ 84} Before that time, Ohio had recognized an insanity defense that the Supreme Court of Ohio described as "arguably less expansive than that espoused by the drafters of the Model Penal Code, see Section 4.01,9 [but] * * * considerably more flexible than the *M'Naghten* rule."  *Wilcox,* 70 Ohio St.2d at 188, 436 N.E.2d 523, referencing *M'Naghten's Case*, 10 C. & F. 200, 8 Eng.Rep. 718 (H.L.1843).

{¶ 85} The rule in *M'Naghten's Case* was that:

"the jurors ought to be told ... that to establish a defence on the ground of

insanity, it must be clearly proved that, at the time of the committing of the

---

[11] R.C. 2901.05(A) discusses the burden of going forward and the burden of proof for affirmative defenses.  As relevant to this case, Donovan had the burden of proving insanity by a preponderance of the evidence.

act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong."

*Clark v. Arizona*, 548 U.S. 735, 747, 126 S.Ct. 2709, 165 L.Ed.2d 842 (2006), quoting *M'Naghten* at 210.

{¶ 86} "The first part [of the rule] asks about cognitive capacity: whether a mental defect leaves a defendant unable to understand what he is doing. The second part presents an ostensibly alternative basis for recognizing a defense of insanity understood as a lack of moral capacity: whether a mental disease or defect leaves a defendant unable to understand that his action is wrong." *Clark* at 747. As amended, R.C. 2901.01(A)(14) left "only moral incapacity as the nub of the stated definition." *Id.* at 748, discussing 1993 Ariz. Sess. Laws Ch. 256, §§ 2-3, which is essentially like Ohio's statute.

{¶ 87} As articulated by the Supreme Court of Ohio, the rule its courts had followed before the insanity defense was modified in 1990 was that:

"One accused of criminal conduct is not responsible for such criminal conduct if, at the time of such conduct, as a result of mental disease or defect, he does not have the capacity either to know the wrongfulness of his conduct or to conform his conduct to the requirements of law. * * * "

(Citations omitted.) *Wilcox* at 188, quoting *State v. Staten*, 18 Ohio St.2d 13, 247 N.E.2d 293 (1969), paragraph one of the syllabus.

{¶ 88} The definition of insanity adopted in 1990 omits the phrase "or to conform his conduct to the requirements of the law," which has been commonly known as

"irresistible impulse." *State v. Mitchell*, 2d Dist. Montgomery No. 26887, 2016-Ohio-7691, ¶ 26, fn.3. In *Staten*, the Supreme Court of Ohio discussed a long line of its decisions which applied a more liberal rule than *M'Naghten* and had held that "an accused will have no criminal responsibility for an act if he had no ability to refrain from doing that act." *Staten* at 17. This line of cases began with *Clark v. State*, 12 Ohio 483, 1843 WL 49 (Dec. 1843), which was decided the same year as *M'Naghten* – a fact the court noted in *Staten*. *Id.* at 15. Ultimately, the court adopted an insanity instruction for juries that encompassed situations where the defendant "did not have the ability to refrain from doing" the criminal act with which he or she was charged. *Id.* at 21.

**{¶ 89}** The reasons the Supreme Court of Ohio gave for adopting the instruction were similar to those Nicholas advances for allowing an irresistible impulse instruction here. Specifically, a deterrent effect would not be accomplished because "one, who does not know that his action is wrong or does not have the capacity to avoid such actions, is not a proper subject for punishment." *Id*. at 20. In addition, the court noted that the public was adequately protected from persons found not guilty by reason of insanity by two statutes. First, R.C. 2943.03 contained a conclusive presumption of the sanity of persons who do not plead guilty by reason insanity, and allowed a plea to be changed for good cause prior to the commencement of trial. *Id.* at 19. Notably, this section of the Ohio Revised Code has remained the same in pertinent part. The second statute, R.C. 2945.39, contained various requirements for releasing a defendant who had been civilly committed after being acquitted by reason of insanity, including a determination " 'that said defendant's sanity has been restored, and that his release will not be dangerous.' " *Id.* at 19, quoting former R.C. 2945.39. Similar procedures are currently contained in

R.C. 2945.40(F) and (G), R.C. 2945.401, and R.C. 2945.402.

{¶ 90} Nonetheless, despite the thinking of the Supreme Court of Ohio on the subject, the legislature decided in 1990 to exclude what is commonly known as the "irresistible impulse" defense, and to only allow the part of *M'Naghten* that pertains to moral incapacity.[12]  Although Ohio law on this point is clear, Nicholas's position is that we should adopt a different standard for juveniles, because doing otherwise would violate the Eighth Amendment prohibition against cruel and unusual punishment.

{¶ 91} "The Eighth Amendment to the United States Constitution states, 'Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.'  A key component of the Constitution's prohibition against cruel and unusual punishment is the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.' "  *State v. Moore*, 149 Ohio St.3d 557, 2016-Ohio-8288, 76 N.E.3d 1127, ¶ 31, quoting *Weems v. United States*, 217 U.S. 349, 367, 30 S.Ct. 544, 54 L.Ed. 793 (1910).  " 'Protection against disproportionate punishment is the central substantive guarantee of the Eighth Amendment.' " *Id.*, quoting *Montgomery v. Louisiana*, __ U.S. __, 136 S.Ct. 718, 732-733, 193 L.Ed.2d 599 (2016).

{¶ 92} Two classifications of proportionality review exist.  One involves the length of sentences in particular cases, and the other involves categorical restrictions.  *Moore* at ¶ 32.  As to categorical restrictions, there are two subsets.  The subset that might

---

[12] In the decision of whether to impose the death penalty, however, Ohio does allow consideration of the mitigating factor of "[w]hether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law."  R.C. 2929.04(B)(3).

apply here is the one that "considers the characteristics of the offender." *Id.*[13] An example would be that the Eighth Amendment prohibits execution of "mentally retarded" offenders. *Id.*, citing *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). Assuming that the Eighth Amendment applies, the category here would be children who, because of mental illness, are unable to refrain from committing the offenses with which they have been charged.

{¶ 93} "The prohibition against 'cruel and unusual punishments,' like other expansive language in the Constitution, must be interpreted according to its text, by considering history, tradition, and precedent, and with due regard for its purpose and function in the constitutional design. To implement this framework we have established the propriety and affirmed the necessity of referring to 'the evolving standards of decency that mark the progress of a maturing society' to determine which punishments are so disproportionate as to be cruel and unusual." *Roper v. Simmons*, 543 U.S. 551, 560--561, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), quoting *Trop v. Dulles*, 356 U.S. 86, 100--101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion). For purposes of analysis, "[t]he beginning point is a review of objective indicia of consensus, as expressed in particular by the enactments of legislatures that have addressed the question." *Id.* at

---

[13] We say "might apply" because, in a similar situation, a California court of appeals found that the defendant failed to "provide even the most narrow of analytic bridges from decisions concerned with the constitutional proportionality of punishment to the insanity defense." *People v. Marsh*, 20 Cal.App.5th 694, 698, 229 Cal.Rptr.3d 457, 460 (Cal.App.2018). In this regard, the court remarked that "the constitutional protection against disproportionate punishment is interested in the nature of the conduct at issue only to the extent it supports the method or nature of the penalty imposed for the criminal violation * * * ; it does *not* prohibit punishment for conduct *in response* to an irresistible impulse such as addiction to alcohol * * * ." (Emphasis sic.) *Id.*, citing *Powell v. Texas,* 392 U.S. 514, 531-532, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968). We agree.

564.

{¶ 94} Before embarking on that analysis, we note that in discussing general characteristics of children, the Supreme Court of the United States has said:

First, children have a " 'lack of maturity and an underdeveloped sense of responsibility,' " leading to recklessness, impulsivity, and heedless risk-taking. * * * Second, children "are more vulnerable ... to negative influences and outside pressures," including from their family and peers; they have limited "contro[l] over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. * * * And third, a child's character is not as "well formed" as an adult's; his traits are "less fixed" and his actions less likely to be "evidence of irretrievabl[e] deprav[ity]."

*Miller v. Alabama*, 567 U.S. 460, 471, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), quoting *Roper.* at 569- 570.

{¶ 95} In *Roper*, the court also stressed that "[t]he reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." *Roper* at 570.

{¶ 96} Nonetheless, while we recognize the lesser culpability generally of juveniles, the national consensus does not support expanding the definition of insanity to include situations where a juvenile is unable, because of mental illness, to conform his

conduct to the requirements of the law.

**{¶ 97}** As noted, Ohio follows the *M'Naghten* rule with respect to "a lack of moral capacity: whether a mental disease or defect leaves a defendant unable to understand that his action is wrong," but not with regard to the lack of cognitive capacity. *Clark,* 548 U.S. at 747, 126 S.Ct. 2709, 165 L.Ed.2d 842. In *Clark*, the court rejected the defendant's assertion that Arizona's similar excision of the cognitive capacity element of the test offended fundamental principles of justice. To the contrary, the court stressed that "[h]istory shows no deference to *M'Naghten* that could elevate its formula to the level of fundamental principle, so as to limit the traditional recognition of a State's capacity to define crimes and defenses." *Id.* at 749.

**{¶ 98}** Continuing this line of reasoning, the court noted that:

Even a cursory examination of the traditional Anglo-American approaches to insanity reveals significant differences among them, with four traditional strains variously combined to yield a diversity of American standards. The main variants are the cognitive incapacity, the moral incapacity, the volitional incapacity, and the product-of-mental-illness tests. The first two emanate from the alternatives stated in the *M'Naghten* rule. The volitional incapacity or irresistible-impulse test, which surfaced over two centuries ago (first in England, then in this country), asks whether a person was so lacking in volition due to a mental defect or illness that he could not have controlled his actions. And the product-of-mental-illness test was used as early as 1870, and simply asks whether a person's action was a product of a mental disease or defect. Seventeen States and the Federal

Government have adopted a recognizable version of the *M'Naghten* test with both its cognitive incapacity and moral incapacity components. One State has adopted only *M'Naghten's* cognitive incapacity test, and 10 (including Arizona) have adopted the moral incapacity test alone. Fourteen jurisdictions, inspired by the Model Penal Code, have in place an amalgam of the volitional incapacity test and some variant of the moral incapacity test, satisfaction of either (generally by showing a defendant's substantial lack of capacity) being enough to excuse. Three States combine a full *M'Naghten* test with a volitional incapacity formula. And New Hampshire alone stands by the product-of-mental-illness test. The alternatives are multiplied further by variations in the prescribed insanity verdict: a significant number of these jurisdictions supplement the traditional "not guilty by reason of insanity" verdict with an alternative of "guilty but mentally ill." Finally, four States have no affirmative insanity defense, though one provides for a "guilty and mentally ill" verdict. These four, like a number of others that recognize an affirmative insanity defense, allow consideration of evidence of mental illness directly on the element of mens rea defining the offense.

(Footnotes omitted.) *Clark*, 548 U.S. at 749-52, 126 S.Ct. 2709, 165 L.Ed.2d 842.

**{¶ 99}** The *Clark* court therefore concluded that, "[w]ith this varied background, it is clear that no particular formulation has evolved into a baseline for due process, and that the insanity rule, like the conceptualization of criminal offenses, is substantially open to state choice." *Id.* at 752.

{¶ 100} *Clark* was decided in 2006, and our examination of the authorities the court cited in footnotes 12-22 indicates no significant shift in the thinking of the various courts and legislatures on this issue. Furthermore, concerning the sanity defense, most federal circuits at one point had adopted Section 4.01 of the Model Penal Code of the American Law Institute, which stated that "[a] person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law." *United States v. Brawner*, 471 F.2d 969, 979 (D.C.Cir.1972), quoting Section 4.01(1). This was a more liberal definition than *M'Naghten*. However, federal legislation (the Insanity Defense Reform Act), enacted in 1984 and "codified at 18 U.S.C. § 17, formerly § 20) marked a return to the cognitive *M'Naghten* test and made insanity an affirmative defense which the defendant must prove by clear and convincing evidence. Further, § 17 provides that beyond insanity, " '[m]ental disease or defect does not otherwise constitute a defense.' " *United States v. Twine*, 853 F.2d 676, 678 (9th Cir.1988). Federal courts did conclude, however, that "the 1984 Act does not abolish the diminished capacity defense." *Id.*

{¶ 101} In passing the Insanity Defense Reform Act, "Congress appeared to be primarily concerned with shifting and increasing the burden of proof in insanity defense cases, as well as eliminating the volitional prong of the defense in order to avoid its unwarranted application in some cases, * * * in which the available expert witnesses disagreed as to the defendant's mental condition." *United States v. Denny-Shaffer*, 2 F.3d 999, 1013-14 (10th Cir.1993) (applying the statute in a case involving multiple personality disorder).

{¶ 102} Based on the preceding discussion, there is no objective indicia of a consensus on this issue, and, therefore, no basis for concluding that an Eighth Amendment violation existed, even if this amendment applied. *Roper*, 543 U.S. at 564, 560-561, 125 S.Ct. 1183, 161 L.Ed.2d 1. Accordingly, the Second Assignment of Error is overruled.

IV. Jury Instructions

{¶ 103} Nicholas's Third Assignment of Error states that:

> The Trial Court Denied [Nicholas's] Right to Due Process and a Fair Trial When It Instructed the Jury that an Act by Someone With Multiple Personalities is Voluntary "So Long as * * * the Personality Then Controlling His Behavior * * * Was Conscious and His Actions Were a Product of His Own Volition.

{¶ 104} Under this assignment of error, Nicholas contends that the trial court erred in instructing the jury about the voluntary nature of his acts. According to Nicholas, the trial court should have used only *Ohio Jury Instructions* (OJI), CR Section 417.07, which deals with actions done while an individual is unconscious due to blackout, coma, and the like. As support, Nicholas points to case law indicating that when an act is done by an alternate personality, the host personality did not act voluntarily.

{¶ 105} Prior to trial, the court held a hearing concerning the State's motion in limine to preclude Nicholas from pursuing an insanity defense. At the hearing, Dr. Hrinko stated that Nicholas suffered from a severe mental defect (DID) at the time of the murder, but that Nicholas did not meet the criteria under current Ohio law for the defense of not

guilty by reason of insanity because Nicholas was able to appreciate the wrongfulness of his act. July 11, 2018 Motion Hearing Transcript, p. 39-41, 45 and 48. However, Dr. Hrinko also concluded that Nicholas "was not able to conform his conduct to the standards of the law or what is expected at that time due to experiencing an irresistible impulse in the form of an alternate personality dominating." *Id.* at p. 44. This latter opinion was proffered for purposes of appeal. *Id.* at p. 43-44.

{¶ 106} After hearing the evidence, the trial court filed an entry granting the State's motion in limine. The court concluded that Nicholas had presented insufficient evidence of a factual issue for the jury to be asked to decide whether at the time of the homicide, Nicholas "did not know, as a result of the severe mental disease or defect, the wrongfulness of his acts." Entry Granting State's Motion in Limine (July 12, 2018), p. 13. Thus, the court concluded that Nicholas would not be able to introduce evidence at trial of "any subject matter that alludes to, or is in support of the affirmative defense of insanity, or the legal theories of 'irresistible impulse,' or 'diminished mental capacity.' " *Id.* at p. 14.

{¶ 107} During trial, defense counsel asked the court to reconsider its liminal ruling on insanity. Transcript of Jury Trial ("Jury Tr."), p. 351-352. While the court rejected that request, the parties did discuss whether the defense could present evidence about Jeff the Killer. Initially, the State had elected to present evidence about Jeff in the form of the 911 call and testimony about the call. *Id.* at 352. After a lengthy discussion, the trial court concluded that the evidence would also be admissible on the issue of whether Nicholas's actions were voluntary. *Id.* at p. 352-398. In this regard, the court primarily relied on R.C. 2901.21(F)(2) and *State v. Ireland*, 2017-Ohio-263, 111 N.E.3d 468 (10th

Dist.).[14]

{¶ 108} Based on the discussion with the court, both the State and defense asked the court to provide pertinent instructions to the jury. The State requested that the court instruct the jury that a "person acts voluntarily when regardless of the personality in control, the person was aware of the actions as they occurred, and his actions were a product of his volition, even if it was the volition of an alternative personality." State Motion #6 (July 18, 2018), p. 2. Nicholas opposed that instruction, asked the court to include OJI 417.07. Jury Tr., p. 722 and 725.

{¶ 109} After further discussion with the parties, the trial court stated that it intended to give a compromise instruction, taking part from R.C. 2901.21(A) and (F)(2), part from a dictionary, part from OJI 417.07, and part from the State's proposed instruction. Id. at p. 734-735. The instruction the court gave stated:

Voluntariness. A person is not guilty of an offense if the person's liability is based on conduct that includes an involuntary act. Reflexes, convulsions, body movements during unconsciousness or sleep, and body movements that are not otherwise a product of the actor's will or violation are involuntary acts.

Volition means the power of choosing or determining or an act of making a choice or a decision.

* * *

If you have a reasonable doubt that the Defendant was conscious at

---

[14] After Donovan's trial, the Supreme Court of Ohio reversed the decision in *Ireland*. *See State v. Ireland*, 155 Ohio St.3d 287, 2018-Ohio-4494, 121 N.E.3d 285. We will discuss the reversal in more detail later.

the time of such act, you must find that he is not guilty. If you find that the Defendant was not conscious, such finding does not relieve the State of its burden by establishing by the required weight of the testimony all elements of the crime charged or any lesser included offense or that the act was purposely committed.

Although at the time of the act a person may be split from his primary personality and in the state of consciousness of a secondary personality, the actions of a person [with] multiple personalities are conscious and voluntary when the evidence fails to establish that the second personality was either unconscious or acting involuntarily.

It is immaterial whether the person was in one state of consciousness or another, so long as being in the personality then controlling his behavior[,] he was conscious and his actions were a product of his own volition.

Jury Tr., p. 775-776.

{¶ 110} According to Nicholas, the court's instructions were correct until the discussion of a split personality, which imputed the consciousness of an alternate personality and was taken from *State v. Grimsley*, 3 Ohio App.3d 265, 444 N.E.2d 1071 (1st Dist.1982). Nicholas argues that *Grimsley* was wrongly decided and represents the narrowest test for DID in the United States. Nicholas contends that we should, instead, adopt the standard used in *United States v. Denny-Shaffer*, 2 F.3d 999, 1003 (10th Cir.1993).

{¶ 111} "[J]urisdictions have fashioned three primary tests to determine the proper mens rea of the multiple: alter, unified and host tests." Smythe, *Uninvited Guests Crash*

*A Party for One: Multiple Personality Disorder & the Criminal Law's Derision Toward Multiples*, 6 J.L. Society 179, 189 (2005). *Grimsley* is classified as having used the "alter" test, while *Denny-Shaffer* represents the "host" test. *Id.* at 191 and 194. Nicholas has not advocated use of the unified test, which is not commonly used because it does not consider a defendant's mental illness. *Id.* at 193.

{¶ 112} "A trial court has broad discretion to decide how to fashion jury instructions, but it must 'fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder.' " *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, ¶ 46, quoting *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus. "We require a jury instruction to present a correct, pertinent statement of the law that is appropriate to the facts." *Id.*, citing *State v. Griffin*, 141 Ohio St.3d 392, 2014-Ohio-4767, 24 N.E.3d 1147, ¶ 5. " 'In examining errors in a jury instruction, a reviewing court must consider the jury charge as a whole and "must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights." ' " *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 135, quoting *Kokitka v. Ford Motor Co.*, 73 Ohio St.3d 89, 93, 652 N.E.2d 671 (1995). (Other citation omitted.) "Whether the jury instructions correctly state the law is a question that is reviewed de novo." *Id.*

{¶ 113} In de novo review, "we apply the same standards as the trial court." *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127, 2007-Ohio-2722, 873 N.E.2d 345, ¶ 16 (2d Dist.). Before we conduct that review, we will briefly comment on *State v. Ireland,* the case the trial court relied on to conclude that evidence about Nicholas's

alternate personality was relevant to the issue of whether he voluntarily committed the murder.   Nicholas has also mentioned this case in his brief.   *See* Appellant's Brief, p. 32 (indicating that a blackout is an affirmative defense.)

**{¶ 114}** In *Ireland*, the defendant was convicted of felonious assault after severely injuring the victim during a fight outside a bar.   *Ireland*, 155 Ohio St.3d 287, 2018-Ohio-4494, 121 N.E.3d 285, at ¶ 52 (DeGenaro, J., concurring in judgment only.)   In the trial court, the defendant claimed that he had "experienced 'a dissociative episode' due to his PTSD" and requested a blackout instruction.   *Id*. at ¶ 3-4.   The trial court gave an instruction similar to the first three paragraphs of the instructions involved in this case (in other words, without the part concerning split personalities), but stated that this was an affirmative defense.   *Id*. at ¶ 6.

**{¶ 115}** After Ireland appealed, the Tenth District Court of Appeals "held that the trial court committed structural error by instructing the jury that Ireland had the burden of proving his blackout defense."   *Id*. at ¶ 9.   The reasoning of the court of appeals was that, under "the plain language of R.C. 2901.21(A), voluntariness is an essential element of a criminal offense."   *Id*.   The court therefore concluded that Ireland did not have the burden of proof.   In addition, the court found that blackout did not meet the requirements in R.C. 2901.05(D)(1)(b) for an affirmative defense.   *Id*. at ¶ 9 and 14.   Having found structural error, the court reversed and remanded for a new trial.   *Id*. at ¶ 9.

**{¶ 116}** On further appeal, the Supreme Court of Ohio reversed the Tenth District's decision.   However, the precise meaning of the court's opinion is unclear.   The opinion consists of a lead opinion in which two justices concurred; these justices concluded that the blackout defense met "all three requirements of R.C. 2901.05(D)(1)(b)" and was an

affirmative defense. *Id.* at ¶ 20-24. The lead opinion further stated that "[a]s written, R.C. 2901.21(A) provides that for a person to be found guilty of a criminal offense, the person must have voluntarily committed a criminal act. We cannot ignore the fact that the word 'voluntary' appears in the criminal-liability-and-culpability statute." *Id.* at ¶ 31.

{¶ 117} From this perspective, the lead opinion supports the trial court's decision to allow Nicholas to present evidence about Jeff the Killer and to instruct the jury on voluntariness. However, the lead opinion went on to state:

> Voluntariness is not an essential element of the offense such that it must be charged in the indictment or addressed in the trial court's jury instructions, even if the need for the act to be voluntarily committed is stated in the statutory scheme; rather, a challenge to voluntariness is a defense. This conclusion is supported by the General Assembly's decision to define "voluntary act" in the negative: "[r]eflexes, convulsions, body movements during unconsciousness or sleep, and body movements that are not otherwise a product of the actor's volition, are involuntary acts," R.C. 2901.21(F)(2). Thus, while the state is required to present evidence that the defendant committed the criminal act voluntarily, and while the jury can weigh the state's evidence against the defendant's counter evidence, the defendant is nonetheless required to prove excuses that are peculiarly within his knowledge in support of which he could fairly be required to adduce evidence by a preponderance of the evidence.

*Ireland*, 155 Ohio St.3d 287, 2018-Ohio-4494, 121 N.E.3d 285, at ¶ 34.

{¶ 118} Under this theory, Nicholas benefitted from the fact that the jury was not

instructed that he had the burden of proof on the issue of whether his conduct was voluntary. However, this was not the majority opinion of the Supreme Court of Ohio. Justice O'Connell concurred in judgment only, without expressing any views, two other justices concurred in judgment only and recounted different grounds for doing so, and two other justices dissented. The two justices who concurred in the judgment only on different grounds disagreed with both the lead opinion and the dissent on the issue of whether the burden of proof issue should even be considered. *Id.* at ¶ 50-51. (DeGenaro, J., concurring in judgment only.)

{¶ 119} Specifically, Justice DeGenaro stated that:

* * * I would reverse the Tenth District's judgment because its holding was premised on the incorrect notion that the trial court used "blackout" in appellee Darin Ireland's specific case to connote an unconscious, involuntary act as contemplated in R.C. 2901.21(A)(1) and (F)(2). In the actual context of Ireland's case, the term "blackout" was used as a placeholder for his insanity-related defense.

Because Ireland's case did not actually involve an unconsciousness claim under R.C. 2901.21, his argument in the Tenth District regarding the proper burden of proof for such a claim was hypothetical and solicited an advisory opinion. We provide no service to trial judges and litigants in Ohio by issuing our own advisory opinion about the burden of proof that would apply to a defense that was not substantively part of Ireland's jury charge. I respectfully disagree with the premise of both the lead opinion and the dissent that we should reach the question of what burden of proof would

apply to an unconsciousness claim.

*Id.* at ¶ 50-51.

**{¶ 120}** The concurrence further stated that "[i]t may or may not be true that a claim of unconsciousness constitutes an affirmative defense. But that is an issue we should wait to consider until we have a proper unconscious, involuntary-act scenario before us. Answering the question in this case results in an advisory opinion at best, and at worst, it sows confusion regarding the legal meanings of unconsciousness, insanity, and diminished capacity." *Id.* at ¶ 68.

**{¶ 121}** As noted, two justices dissented. Justice Kennedy's dissenting opinion, in which Justice DeWine concurred, stated that:

The lead opinion wants it both ways, arguing that the state bears the burden to prove beyond a reasonable doubt that the accused committed the offense of felonious assault with a voluntary act while the accused bears the burden of proving by a preponderance of the evidence and as an affirmative defense that the same act was involuntary because the accused lacked consciousness. The proper analysis, however, begins and ends with the elements of the offense: once it is determined that voluntariness— and therefore consciousness—is an element of felonious assault, the state retains the burden of proving it beyond a reasonable doubt regardless of whether lack of consciousness is characterized—or asserted—as a "blackout" defense. Because such a defense asserts that the state has failed to prove an element of the offense, it can never be an affirmative defense.

Pursuant to R.C. 2901.21(A), a conscious, voluntary act is an element of every offense in Ohio; the state bears the burden of proving that element beyond a reasonable doubt, and the burden of proof remains with the state throughout the trial. Any contrary evidence presented by the accused relating to a lack of consciousness or a blackout defense does not assert an affirmative defense on which the accused bears the burden of proof but rather is presented to persuade the jury that the state has not carried its burden of proving guilt beyond a reasonable doubt in the first place. Blackout is a failure-of-proof defense, not an affirmative defense.

*Id.* at ¶ 69-70 (Kennedy, J., dissenting).

{¶ 122} While *Ireland* does not directly apply to the issue before us, it does indicate that, to the extent the holding can be deciphered, Nicholas may have received the benefit of not having to prove an affirmative defense.

{¶ 123} Returning to the issue of the remaining part of the instruction (split personality), there is limited authority in Ohio concerning jury instructions in cases involving DID. As noted, the instruction was taken from *Grimsley*, 3 Ohio App.3d 265, 444 N.E.2d 1071.

{¶ 124} In *Grimsley*, the defendant's conviction for driving while under the influence of alcohol was reversed on appeal due to denial of her right to a jury trial. *Id.* at 267-268. Due to the need for a new trial, the court of appeals addressed her other assignments of error. One of the assigned errors related to the defendant's contention that she could "not be held liable for any offense because at the time of the offense she was dissociated from her primary personality (Robin) and in the state of consciousness

of a secondary personality (Jennifer). She contends that she was not acting either consciously or voluntarily." *Id.* at 268.

**{¶ 125}** The evidence was uncontroverted that the defendant met all the criteria for a multiple personality disorder. *Id.* In addition, the defendant contended "that when she is Jennifer, Robin is unaware of what is going on, has no control over Jennifer's actions, and no memory of what Jennifer did later on when she is restored to the primary personality of Robin." *Id.*

**{¶ 126}** In contrast, in the case before us, Nicholas indicated that he was aware of what was going on, although he was in a trance-like state and did have memory of what had happened. However, like the defendant in *Grimsley*, Nicholas claimed he had no control over his alternate personality's actions.

**{¶ 127}** The court of appeals in *Grimsley* was not persuaded by the defendant's arguments and essentially concluded, even if the alternate personality were in control, there was no evidence that the alternate personality "either was unconscious or acting involuntarily." *Id.* The court, therefore, formulated the following holding, which the trial court here paraphrased in its instructions:

> The actions of a person with a multiple personality disorder are conscious and voluntary within the meaning of R.C. 2901.21, although at the time of the act she was dissociated from her primary personality and in the state of consciousness of a secondary personality, when the evidence fails to establish the secondary personality was either unconscious or acting involuntarily. It is immaterial whether the person was in one state of consciousness or another, so long as being in the personality then

controlling her behavior, she was conscious and her actions were a product of her own volition.

*Id.* at 265.

{¶ 128} As we noted, the law in Ohio on the subject is sparse. In a case involving a woman with at least seven personalities, the court found that a finding of guilty on driving under the influence and felonious assault charges, rather than not guilty by reason of insanity, was not against the manifest weight of the evidence. Relying on *Grimsley*, the court stated that "the personality in control at the time of the incident was [the defendant's] twin sister persona. This demonstrates that, even if this alternate personality was in control, that personality was capable of understanding the wrongfulness of her actions, even if she was drunk at the time because voluntary intoxication is not a valid defense." *State v. Dumas*, 8th Dist. Cuyahoga No. 97076, 2012-Ohio-91, ¶ 16. *See also Akron v. Peoples*, 9th Dist. Summit No. 25398, 2011-Ohio-579, ¶ 20-21 (in a case involving a claimed blackout due to medication, the trial court did not err in refusing to give a coma/blackout instruction, as evidence indicated the defendant was "in one state of consciousness or another" when she took actions both before and during an encounter where she struck a police cruiser with her car).

{¶ 129} As noted, Nicholas contends that the standard from *Denny-Shaffer*, 2 F.3d 999, should be used. In *Denny-Shaffer*, a woman had kidnapped a baby from a hospital and was charged with various federal crimes, including kidnapping. *Id*. at 1002. While she claimed she was insane under 18 U.S.C. 17(a) (the federal equivalent of *M'Naghten*), the trial court refused to allow the defense or to instruct on the insanity defense. *Id*.

{¶ 130} The federal and defense experts both agreed that alternate personalities

of the defendant were in control at the time of the kidnapping, but had varied views about the host or dominant personality's participation in preparing or carrying out the kidnapping. *Id.* at 1004. Due to "lack of evidence concerning the alters, the judge rejected the insanity defense and refused to submit instructions on it to the jury." *Id.*

**{¶ 131}** After reviewing the defendant's background of childhood and adult physical and sexual abuse, the court of appeals noted that both experts agreed that the host personality was not aware of the crime, did not participate in the crime, and could not control the personalities who carried out the kidnapping. *Id.* at 1008. However, neither expert "could establish that the alter personality in control of defendant at the time of the offense was legally insane, i.e., 'unable to appreciate the nature and quality or the wrongfulness of [defendant's] acts.' " *Id.,* quoting 18 U.S.C. 17(a).

**{¶ 132}** In discussing the insanity defense, the court of appeals observed that the trial court had restricted its application solely to the alternate personalities and therefore had "limited consideration of the evidence to that dealing with the alter or alters acting at the time of the offense, requiring proof as to that alter or alters to satisfy the statute, and denying consideration of the evidence dealing with the dominant or host personality of the defendant to satisfy the insanity defense statute as the judge construed it." *Id.* at 1012. The court of appeals held this was error. *Id.* at 1013.

**{¶ 133}** In concluding that sufficient evidence existed to let the insanity defense be presented to the jury, the court of appeals remarked:

> Here there is evidence for the defendant plainly sufficient to support inferences by the trier of fact that Denny-Shaffer suffers from a severe mental defect or disease [multiple personality disorder]; that at the time of

the abduction, her dominant or host personality was not in control so as to cause commission of the offense, and was not aware that an alter personality or personalities were the cognizant parties controlling the physical actions; that as a result of defendant's severe mental disease or defect, the host or dominant personality was unable to appreciate the nature and quality or wrongfulness of the conduct which the alter or alters controlled; and that defendant had proven these facts by clear and convincing evidence.

(Footnote omitted.)  *Id.* at 1016.

{¶ 134} Notably, this part of the opinion related only to whether the trial court erred in rejecting the insanity defense.  This is not an issue that has been presented in the case before us.  Instead, Nicholas's argument that we should adopt the "standard" in *Denny-Shaffer* is simply a disguised request that we change the law in Ohio.  Even if we were inclined to do so (which we are not), there are significant differences between Nicholas and the defendant in *Denny-Shaffer*.  Specifically, unlike the defendant in that case, Nicholas was aware at all times of the actions of Jeff the Killer and was aware of the wrongfulness of the actions.  For the same reasons, the trial court also did not err in instructing the jury about Nicholas's split personality.

{¶ 135} The court of appeals in *Denny-Shaffer* did go on to consider *Grimsley*. Ultimately, the court found that *Grimsley* and two Georgia state cases that had followed *Grimsley's* approach provided "no convincing analysis * * * which would justify rejection of an insanity defense as not submissible under § 17 for the trier of fact when evidence as strong as that in Denny-Shaffer's case on her mental disorder is presented."  *Denny-*

*Shaffer* at 1017. Again, these are factual considerations concerning whether the evidence of insanity is sufficient to be submitted to a jury.

{¶ 136} Having conducted the appropriate review of the trial court's jury instructions, we find no error. To the contrary, the instruction are consistent with Ohio law. If change is to occur, it must come from the legislature. Accordingly, the Third Assignment of Error is overruled.

## V. Alleged Ineffective Assistance of Counsel

{¶ 137} Nicholas's Fourth Assignment of Error states:

[Nicholas] Was Denied the Effective Assistance of Counsel.

{¶ 138} Under this assignment of error, Nicholas contends that trial counsel was ineffective because he failed to present evidence that a splinter personality emerged to cope with family trauma. Nicholas further contends that, absent that evidence, presenting evidence of the strained personal relationship between Nicholas and Taylor only served to establish a motive for the murder. According to Nicholas, he was prejudiced by this because without proof of a motive, there was a reasonable probability that the jury would have rejected the argument that Nicholas, as opposed to Jeff the Killer, planned to kill Taylor. In this regard, Nicholas does not claim that he would have been found innocent; his argument is that the jury would not have convicted him of aggravated murder, which requires prior calculation and design.

{¶ 139} The standards for deciding whether counsel has been ineffective are well established. "Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable

representation and, in addition, prejudice arises from counsel's performance." *State v. Bradley*, 42 Ohio St.3d 136, 137, 538 N.E.2d 373 (1989), paragraph two of the syllabus, following *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Id.* at paragraph three of the syllabus. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

{¶ 140} "*Strickland* charges us to '[apply] a heavy measure of deference to counsel's judgments,' * * * and to 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " *State v. Sanders*, 94 Ohio St.3d 150, 151, 761 N.E.2d 18 (2002), quoting *Strickland* at 691 and 689. "To justify a finding of ineffective assistance of counsel, the appellant must overcome a strong presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995), citing *Strickland* at 689.

{¶ 141} As noted previously, the trial court denied Nicholas's request to permit non-expert insanity testimony and granted the State's liminal motion to exclude any testimony or evidence concerning either diminished capacity or Nicholas's not guilty plea by reason of insanity. *See* Entry Granting State's Motion in Limine (July 12, 2018). Because the liminal ruling was preliminary, the court did allow Nicholas to maintain his insanity defense, while noting that, without presentation of additional evidence, "the Court would not authorize the question regarding the affirmative defense of insanity to be

submitted to the jury for consideration." *Id.* at p. 14. Presumably because no additional evidence was available, Nicholas's counsel did not present an expert witness on insanity at trial.

**{¶ 142}** From the very beginning of trial, the State attempted to establish a "motive" for the murder. Specifically, the State's first witness was the 911 dispatcher, and Nicholas's 911 call was played. During the call, the following exchange occurred:

NICHOLAS: I – I just killed my mother, and I need to go to the hospital.

* * *

NICHOLAS: It wasn't me who – who killed her. It was Jeff.

* * *

NICHOLAS: Jeff, yeah. I am sorry, it's a little hard to explain. But I kind of have another person inside."

* * *

911 DISPATCHER: (Inaudible) all right. Now why did you hurt your mom or why did Jeff hurt your mom?

NICHOLAS: He was always tired of her. She always – she always did drugs and she told him, like ignore me. Like once she hit me, and she was just – he was done."

Jury Tr., p. 235-238.

**{¶ 143}** The State also presented testimony from Taylor's friend, Angie, who was living with Taylor and Nicholas at the time of the murder. During direct examination, Angie discussed Nicholas and Taylor's relationship and also recounted an encounter the

day of the murder, after Taylor had caught Nicholas "sexting" with a girl. Angie and Taylor were upstairs, and Nicholas came out of his bedroom with laundry in his arms. When Nicholas acted as if he were going to say something, Taylor "put her finger up and said, 'don't say a f*cking word about it. I don't want to hear about it. Your dad is going to handle it when he gets home.' " *Id.* at p. 257. Subsequently, Nicholas's counsel elicited further information from Angie during cross-examination about Nicholas's relationship with Taylor. At the time, Defense counsel would also have been aware of Nicholas's statement to a detective right after the crime that Taylor "was mean to him," "talked poorly to him," on one occasion had struck him in the back with an open hand, and smoked marijuana. *Id.* at p. 437.

{¶ 144} During trial, Nicholas's counsel asked the court to reconsider its ruling on the liminal motion. Jury Tr., p. 351. While the court rejected the request, the parties and court did discuss whether the State's introduction of 911 testimony about Jeff the Killer opened the door to defense evidence on that point. Ultimately, the court decided to allow evidence on this point as it related to the issue of whether Nicholas's actions at the time were voluntary. *Id.* at p. 381-399.

{¶ 145} After the State rested, Nicholas's counsel called Nicholas's father, Shane, to testify. According to Shane, Nicholas and Taylor had a "very rocky" relationship and arguments usually started with over-discipline by Taylor, but there was also an underlying tension. *Id.* at p. 513. Shane stated that he and Taylor had arguments over discipline, that Taylor was the sterner of the two, and that he and Taylor had significant disagreements over Nicholas. *Id.* at p. 514.

{¶ 146} After the parties ended their questioning of Shane, the court and parties

discussed six sets of questions from the jury, and the court decided which questions it would ask. Jury Tr., p. 519-535. The court then asked Nicholas's counsel how many witnesses he expected. At that time, counsel said he had three witnesses, proffered what they would say, and stated that "none of these are make or break witnesses anyhow. I more or less got the impression they wouldn't be allowed to testify." *Id.* at p. 536. After outlining permissible areas of testimony, like Nicholas's difficulty adjusting to his new school and Taylor's authoritativeness, the court said, "The one thing you might want to consider is if your witnesses are saying Nicholas and Heidi [Taylor] were always having friction and Heidi was the disciplinarian, doesn't that lead to the Defendant having more motive to commit the offense?" *Id.* at p. 136. Nicholas's counsel then said, "Yeah, it does." *Id.* Counsel then outlined his plans for remaining testimony and said that he would probably excuse the three witnesses. *Id.* at p. 537.

{¶ 147} The following day (which was the last day of trial), the only defense witnesses who testified were Nicholas and his school friend, T.D. The point of presenting these two witnesses was to establish the existence of Jeff the Killer prior to the day of the murder and to explain Nicholas's side of the story, i.e., that Jeff was an alternate personality, that Jeff had previously talked about killing people, that Jeff became stronger over time, that Jeff became enraged with Taylor the day of the murder because Jeff would lose access to M.W. and M.W.'s alter, C.W., with whom Jeff was enamored, that Jeff took over control at the time of the murder, that Nicholas could not control Jeff, and that Nicholas did not want to kill Taylor. The three defense witnesses mentioned the day before were not called by the defense because the court could have limited their testimony, and with respect to the testimony of Alyssa Nicholas (who would have testified

about friction between Nicholas and Taylor), she was not called based on "a strategic decision."   Jury Tr., p. 599.

{¶ 148} During this discussion, Nicholas's counsel also stated that he would have called Dr. Hrinko to testify about Nicholas's severe mental defect, but for the court's liminal motion.   *Id.* at p. 600.   At that time, the court reiterated it would not let the defense call Dr. Hrinko because there was insufficient evidence to form a question about insanity.   *Id.* at 601.

{¶ 149} In view of the above discussion of the facts, we find no evidence that trial counsel acted ineffectively in failing to put on evidence of why a split personality emerges or in presenting evidence of friction between Nicholas and Taylor.   Concerning evidence about the disorder, the trial court had emphatically prohibited expert testimony from Dr. Hrinko prior to trial and would not allow testimony on Nicholas's severe mental disease, because Nicholas did not fit the legal definition of insanity.   Despite additional attempts of the defense during trial, the court did not change its mind.

{¶ 150} Furthermore, in discussing whether the defense would be allowed to introduce evidence about Jeff the Killer, the court stressed that the "issue of voluntariness is separate and apart from the issue of insanity."   Jury Tr., p. 385.   *See also* p. 397 ("I go back to the fact that this has nothing to do with mens rea and everything to do with was the Defendant capable of physically performing the act.")

{¶ 151} Given that the trial court several times refused to allow expert testimony, we would be speculating to think that the court would have allowed general testimony from Dr. Hrinko.   This is particularly true since the court was only initially inclined to allow evidence about Jeff the Killer because the State had opened the door.   Even when the

court did allow evidence on the subject, it was based on the concept of voluntary behavior, not insanity.

{¶ 152} Regarding evidence of the friction between Nicholas and Taylor, the State presented this evidence first, and the defense had to counter the information in some manner. "It is clearly permissible for a party to 'draw the sting' of cross-examination by bringing out, on direct examination, facts that tend to discredit that party's own witness. * * * This is not done to impeach the witness, but to present an image of candor to the trier of fact." *State v. Tyler*, 50 Ohio St.3d 24, 34, 553 N.E.2d 576 (1990).

{¶ 153} In addition, the interaction between Nicholas and Taylor was important as background for Nicholas's testimony at trial. Specifically, during direct examination, Nicholas admitted that the prior testimony about having his phone privileges taken away was accurate. He stated that Taylor did not approve of M.W., that she had "taken [M.W.] away" from him multiple times before, and that he knew it was going to happen again. Jury Tr., p. 624. Nicholas explained, however, that this was Jeff's first time of having that happen. He further stated that "[Jeff's] reaction was different than mine. I was scared of losing [M.W.]. But I was feeling no sense of homicidalness [sic] at all. But Jeff, on the other hand. He was absolutely furious. He is a homicidal person at heart. So, of course, that was the first feeling he was going to have. And with that anger came just a lot of anger." *Id.* at p. 625. According to Nicholas, Jeff took over at that point. *Id.*

{¶ 154} Based on the preceding discussion, trial counsel did not render ineffective assistance of counsel by introducing this evidence. In trying what was concededly a difficult case, counsel chose trial tactics that were well reasoned, even if they did not result in a favorable verdict for Nicholas. The Supreme Court of Ohio has stressed that

courts " 'must assess the reasonableness of the attorney's decisions at the time they are made, not at the time of our assessment.' " *State v. Phillips*, 74 Ohio St.3d 72, 85, 656 N.E.2d 643 (1995), quoting *State v. Wilkins*, 64 Ohio St.2d 382, 390, 415 N.E.2d 303 (1980). "Debatable trial tactics generally do not constitute a deprivation of effective counsel." *Id.*

{¶ 155} Accordingly, Nicholas's Fourth Assignment of Error is overruled.

VI. Imposition of Costs

{¶ 156} Nicholas's Fifth Assignment of Error states:

The Trial Court Erred When It Imposed Statutorily Unauthorized Costs.

{¶ 157} Under this assignment of error, Nicholas contends that his cost bill contains several statutorily unauthorized costs, and he asks that we modify the judgment accordingly. The items in question include: the costs of assigned counsel; $100 charges for every responsive filing made by the State; and warrants for Nicholas's removal to and from COYC. Nicholas also asks that we eliminate the costs for direct appeal transcripts.

{¶ 158} As a preliminary point, the record was supplemented with the "itemized cost bill" that Nicholas references. *See* Trial Court Entry (May 23, 2019), and *State v. Nicholas*, 2d Dist. Champaign No. 18-CA-25 (Decision and Entry, June 6, 2019). We also noted in a later decision and entry that issues regarding the cost bill could be addressed in Nicholas's appellate brief. *See Nicholas* (Decision and Entry, July 8, 2019).

{¶ 159} According to Nicholas's brief, the itemized costs include: $9,819 in counsel costs; $800 for the State's responsive filings (which includes the initial $100 fee for filing

the indictment and $700 for seven responsive filings of the State); two charges of $355 for transporting Nicholas to and from court on July 19, 2018; and $7,126.50 for appellate transcripts. We will consider these issues separately.

## A. Appointed Counsel Costs

{¶ 160} In answering Nicholas's argument about appointed counsel costs, the State notes that Nicholas does not dispute the trial court's actions in awarding the fees, but only challenges the fact that these fees were included in the administrative docket. In this regard, the State says that "[c]ertainly, the administrative docket would not supersede the trial court's order." Appellee's Brief, p. 43.

{¶ 161} According to the documents that are part of the record, Nicholas's counsel submitted a fee application on July 26, 2018 for $9,819.00, and the trial court approved the application on July 27, 2018. This amount was included in the cost bill issued in Nicholas's case.

{¶ 162} As pertinent here, R.C. 2947.23(A)(1)(a) provides that "[i]n all criminal cases, including violations of ordinances, the judge or magistrate shall include in the sentence the costs of prosecution, * * * and render a judgment against the defendant for such costs." According to R.C. 2947.23(A)(2), the following specific amounts are included as costs: fees of jurors, if jurors have been sworn. Consistent with these dictates, the trial court stated in the sentencing entry that Nicholas was to pay the costs of the case and granted judgment for the costs and execution for the costs. Judgment Entry of Conviction, p. 13.

{¶ 163} However, R.C. 2743.23 is not the only statute dealing with costs. R.C.

2941.51(A) provides that the county shall pay for counsel appointed to cases or selected by indigent persons under R.C. 120.16 or R.C. 120.26, or otherwise appointed by the court. R.C. 2941.51(D) further states that:

> The fees and expenses approved by the court under this section shall not be taxed as part of the costs and shall be paid by the county. However, if the person represented has, or reasonably may be expected to have, the means to meet some part of the cost of the services rendered to the person, the person shall pay the county an amount that the person reasonably can be expected to pay.

{¶ 164} Consistent with this statute, the trial court stated in its judgment entry that it had considered Nicholas's financial ability to pay. Judgment Entry of Conviction, p. 13. The court then ordered Nicholas to pay back the costs of the legal fees and expenses and stated that they would be separately collected by the Clerk. *Id.* In addition, the court also specifically stated that while the Clerk had the right to collect amounts being reimbursed under R.C. 2941.51(D) in a civil action, "the fees and expenses shall not be taxed as part of the costs." *Id.* at p. 13. Finally, the court specifically stated that "[t]he Clerk of Courts shall not tax the fees and expenses as part of the court costs per R.C. 2941.51(D)." *Id.* at p. 14.

{¶ 165} We have specifically stressed that "although a defendant can indirectly be required to repay his court-appointed counsel fees as a special condition of probation, he cannot be directly required to repay court-appointed counsel fees as a criminally enforceable sanction and court-appointed counsel fees may not be taxed as costs." *State v. Springs*, 2015-Ohio-5016, 53 N.E.3d 804, ¶ 9 (2d Dist.).

{¶ 166} In the case before us, the trial court also granted judgment "for the legal fees and expenses" and awarded "execution for those fees and expenses." Judgment Entry of Conviction, p. 14. In a similar situation, also involving Champaign County Common Pleas Court, we said that "[w]e consider the 'execution for those fees and expenses is awarded' language in the entry to mean that the county may utilize available civil execution-of-judgment proceedings to collect the judgment and to distinguish the court's decision form one where execution of judgment is stayed." *Springs* at ¶ 11, fn.1. *Accord State v. Webb*, 2d Dist. Champaign No. 2017-CA-9, 2019-Ohio-1145, ¶ 14 ("reimbursement of court costs and court-appointed counsel fees must be pursued through civil collection proceedings"). More importantly, "R.C. 120.04(B)(5) confirms that the collection of any attorney fees under R.C. 2941.51(D) must be separately pursued by the public defender via the civil collection process." *State v. Riley*, 2019-Ohio-3327, 141 N.E.3d 531, ¶ 98 (11th Dist.).

{¶ 167} In view of the above discussion, error occurred because the clerk cannot add the fees to its cost bill. The trial court, therefore, will be directed to order the clerk to remove the attorney fee amount from the cost bill.

### B. Charges for Responsive Pleadings

{¶ 168} Nicholas also argues that the trial court is not permitted to impose $100 fees for responsive filings after the indictment. On the cost bill filed by the clerk, there are charges of $151 for a two-count indictment and another $100 for "multiple count indictment." In addition, fees of $100 each are charged for various State responses or objections to defense motions. The responses are dated: (1) March 7, 2018; (2) March

16, 2018; (3) March 27, 2018; (4) June 27, 2018; (5) June 29, 2018; (6) July 12, 2018; and (7) July 23, 2018.

{¶ 169} "Costs are part of a defendant's final, appealable judgment entry of sentence." *Lingo v. State*, 138 Ohio St.3d 427, 2014-Ohio-1052, 7 N.E.3d 1188, ¶ 39. Furthermore, " 'the subject of costs is one entirely of statutory allowance and control.' " *Centennial Ins. Co. v. Liberty Mut. Ins. Co.*, 69 Ohio St.2d 50, 51, 430 N.E.2d 925 (1982), quoting *State ex rel. Michaels v. Morse*, 165 Ohio St. 599, 607, 138 N.E.2d 660 (1956). "Therefore, imposition of any charge as a court cost must be founded on a statute that permits or requires costs of the classification involved to be imposed." *Jefferson v. Berner*, 2d Dist. Montgomery No. 19031, 2002 WL 857657, *1 (Apr. 26, 2002). The statutory authorization here is based on R.C. 2947.23(A)(1)(a), which states, in pertinent part, that "[i]n all criminal cases * * * the judge or magistrate shall include in the sentence the costs of prosecution * * * and render a judgment against the defendant for such costs."

{¶ 170} R.C. 2947.23 does not define the meaning of "costs of prosecution." This term has been interpreted as " 'court costs' in a criminal case. The expenses which may be taxed as costs in a criminal case are those directly related to the court proceedings and are identified by a specific statutory authorization." *State v. Christy*, 3d Dist. Wyandot No. 16-04-04, 2004-Ohio-6963, ¶ 22. As examples, the court listed costs and expenses expressly listed in the Ohio Revised Code, like "fees of officers and court personnel [R.C. 2303.28], including clerks of court [R.C. 2303.20]; jury fees [R.C. 2947.23]; witness fees [R.C. 2335.05]; interpreters fees [R.C. 2335.09]; and fees of psychologists and psychiatrists [R.C. 2947.06]; etc." *Id.*

{¶ 171} The State has not responded to Nicholas's arguments, other than to

generally assert that the charges are allowed by R.C. Chap. 2303, and by Champaign County Common Pleas Court Rules. The applicable local rules refer to R.C. 2303.20. *See* Loc.R. 2.8(A) of the Champaign County Court of Common Pleas, which states that "The Clerk of Court shall charge the fees as proscribed by R.C. 2303.20."

**{¶ 172}** R.C. 2303.20 provides, in pertinent part, that in cases other than inmate appeals, the clerk "shall charge the following fees and no more":

(A) Twenty-five dollars for each cause of action which shall include the following:

(1) Docketing in all dockets;

(2) Filing necessary documents, noting the filing of the documents, except subpoena, on the dockets;

(3) Issuing certificate of deposit in foreign writs;

(4) Indexing pending suits and living judgments;

(5) Noting on appearance docket all papers mailed;

(6) Certificate for attorney's fee;

(7) Certificate for stenographer's fee;

(8) Preparing cost bill;

(9) Entering on indictment any plea;

(10) Entering costs on docket and cash book.

(B) Two dollars for taking each undertaking, bond, or recognizance;

(C) Two dollars for issuing each writ, order, or notice, except subpoena;

(D) Two dollars for each name for issuing subpoena, swearing

witness, entering attendance, and certifying fees;

(E) Twenty-five dollars for calling a jury in each cause;

(F) Two dollars for each page, for entering on journal, indexing, and posting on any docket;

(G) Three dollars for each execution or transcript of judgment, including indexing;

(H) One dollar for each page, for making complete record, including indexing;

* * *

(L) One dollar for each certificate of fact under seal of the court, to be paid by the party demanding it * * *.

{¶ 173} The statute is mandatory, stating that the clerk shall charge no more than the listed fees. From our reading of the statute, and as relevant here, under R.C. 2303.20, the clerk would be allowed to charge $25 for "[f]iling necessary documents, noting the filing of the documents, except subpoena, on the dockets," and $2.00 "for each page, for entering on journal, indexing, and posting on any docket." R.C. 2303.20(A)(2) and (F). As an example, for the State's response on March 7, which was 10 pages long, the cost would be $25 plus $20, for a total of $45.

{¶ 174} Appendix C of the court's local rules also lets the clerk charge some additional fees. Under "Additional Fees," the clerk may charge $6.00 for the filing of each cause of action, pursuant to R.C. 2303.201(A); an additional $20 for the filing of each cause of action, pursuant to R.C. 2303.201(B); an additional $1.00 for each service performed under R.C. 2303.20(B), (C), (D), (F), (H), and (L), pursuant to R.C.

2303.201(B); and an additional $100 on the filing of each criminal cause, civil action or proceeding, pursuant to R.C. 2303.201(E). *See* Appendix C, Additional Fees, (A)-(D). These provisions are consistent with R.C. 2303.201(A)(1), (B)(1), and (E)(1), which allow courts to charge additional fees for items like technology and special projects.

{¶ 175} The only relevant provision here is R.C. 2303.201(B)(1), which provides, in pertinent part, that:

> The court of common pleas of any county may determine that, for the efficient operation of the court, additional funds are required to make technological advances in or to computerize the office of the clerk of the court of common pleas and, upon that determination, authorize and direct the clerk of the court of common pleas to charge an additional fee, not to exceed * * * one dollar each for the services described in divisions (B), (C), (D), (F), (H), and (L) of section 2303.20 of the Revised Code.

{¶ 176} From the list of described services, the only one involved here is R.C. 2303.20(F). Based on this subsection, the clerk would be authorized to charge an additional dollar "for each page, for entering on journal, indexing, and posting on any docket." Again, referencing the State's March 7, 2018 response, that would amount to an additional charge of $10, making the total fee $55. The $100 charge, therefore, is clearly incorrect. Furthermore, while each listed response on the cost bill bears the same charge of $100, the page amounts of the responses are not all the same. As a result, the clerk's charge appears to be a blanket charge that is not authorized by Appendix C or, more importantly, by R.C. 2303.20 and R.C. 2303.201.

{¶ 177} The State has not referenced any authority for assessing these fees other

than Appendix C and R.C. Chap. 2303. Absent any other explanation, we must conclude that these fees were not properly assessed. As a result, this part of the assignment of error is sustained, and this matter will be remanded to the trial court for a correction of the amounts charged for the State's responses.

### C. Warrants for Removal to and from COYC

{¶ 178} Nicholas challenges a $355 transportation charge that was assessed twice in one day (on July 19, 2018), for a total of $710. According to Nicholas, there should have been only one $67 charge based on statutory requirements and the 27-mile distance between the trial court and the COYC.

{¶ 179} As the State notes, no hearings were held on July 19, 2018; that is simply the day the two warrant returns were filed. The State contends, first, that there is nothing in the record to indicate the mileage from the court to COYC, but that even if one uses the defense mileage figure, the total for the Sheriff's transportation of Nicholas for three days of pretrial hearings in July 2018 and for three days of trial would have been about $712, meaning that no error occurred.

{¶ 180} Concerning sheriff's fees, R.C. 311.17 provides, in relevant part:

Except as provided in a contract entered into under division (A) of section 3125.141 of the Revised Code, for the services specified in this section, the sheriff shall charge the following fees, which the court or its clerk shall tax in the bill of costs against the judgment debtor or those legally liable therefor for the judgment:

(A) For the service and return of the following writs and orders:

* * *

(16) All summons, writs, orders, or notices, for the first name, six dollars, and for each additional name, one dollar.

(B) In addition to the fee for service and return:

(1) On each summons, writ, order, or notice, a fee of two dollars per mile for the first mile, and one dollar per mile for each additional mile, going and returning, actual mileage to be charged on each additional name;

* * *

(3) Jail fees, as follows:

* * *

(b) Taking a prisoner before a judge or court, per day, five dollars;

{¶ 181} According to the State, the fee would have been as follows: 27 miles times four (two round trips) ($104); two dollars for the first mile each day; and five dollars for transporting Nicholas to court, plus $12 for two summons, for a three-day total of $357. For the return trips, the fee would have been less, or total of $355. The total of these amounts is $712 for the six times that Nicholas was transported for court hearing or trial on July 10, 11, 13, 16, 17, and 18, 2018.

{¶ 182} Assuming for purposes of argument that the distance is 27 miles, we agree with the State, although on a slightly different calculation. Based on our reading of the statute, the Sheriff can charge six dollars for the service of orders and summons. A total of $12 was appropriate because two separate warrants were issued per court order on July 9, 2018; one covered July 10, 11, and 13, and the other covered the trial dates of July 16-20, 2018. The trial ended on July 18, and the hearings were held as scheduled,

so $12 was due for the six days of transportation. Six days of transportation would equal 24 trips, based on the Sheriff picking Nicholas up, taking him to trial, returning him to COYC, and then returning back to Champaign County.

{¶ 183} As we read the statute, two dollars is appropriate for the first mile of each summons and one dollar may be assessed for each mile thereafter. Thus, for the six days, $29 would be assessed for two trips, for a total of $58. The remaining 22 trips at $27 each would result in a charge of $594. The total of these amounts would be $652. An additional five dollars per day (or a total of $30) would be due for transporting Nicholas from jail pursuant to R.C. 311.17(B)(3)(b). Adding this amount and the $12 summons amount to $652 results in a total charge of $694 for the six days of transportation. This is slightly less than the total amount of $710, but the difference is minimal. Furthermore, the docket indicates that Nicholas was not charged for a warrant return for a hearing held on January 22, 2018. Thus, Nicholas was slightly undercharged. Accordingly, this part of the assignment of error has no merit.

### D. Transcript Fees

{¶ 184} The final issue relates to transcript fees for the appeal. The charges in the cost bill pertaining to this were $1,340 and $7,126.50, or a total of $8,466.50. Nicholas contends that as an indigent defendant, he is entitled to free transcripts and that requiring him to pay has a chilling effect. In response, the State notes that the transcripts have already been provided to Nicholas without charge, and that the fact that he "may" be required to reimburse the State for the cost at the conclusion of the appeal does not adversely affect him.

{¶ 185} In this case, Nicholas filed a notice of appeal on July 23, 2018, and his docket statement indicated that a transcript of the proceedings would be needed. Nicholas also filed praecipes asking for transmission of the docket and journal entries and for preparation of a transcript of the trial and various other proceedings in the trial court. Nicholas also filed an affidavit of indigency with this court on July 27, 2018. Subsequently, in September 2018, Nicholas asked that we appoint the Ohio Public Defender as counsel due to the seriousness of the case. As requested, we appointed the Ohio Public Defender as Nicholas's counsel on September 26, 2018. The Public Defender then filed an amended praecipe on September 28, 2018, asking for additional parts of the trial court record as well as a complete transcript of the juvenile record and proceedings to be filed. In a separate motion, the Public Defender asked for a complete transcript to be provided to it at the State's expense.

{¶ 186} On October 12, 2018, we sustained the motion of the Ohio Public Defender and ordered Nicholas to take the steps necessary to cause preparation and filing of the transcript of the trial court and juvenile proceedings. On January 9, 2019, the trial court clerk issued an App.R. 11(B) notification, indicating that the record was complete. We subsequently ordered the record to be supplemented with various items, including juvenile court materials, and an amended App.R. 11(B) notice was filed on March 1, 2019. As noted, the record was further supplemented with the cost bill, and another App.R. 11(B) notice was filed in June 2019.

{¶ 187} "The fundamental constitutional right of access to the courts requires that prisoners have a meaningful opportunity to present claims to the courts. * * * Therefore, when a state grants persons convicted a direct appeal as of right, equal protection and

due process of law require that a state furnish appellate courts with trial transcripts in cases involving indigent defendants when transcripts are needed for a full and effective defense on appeal." (Citation omitted.) *State ex rel. Greene v. Enright*, 63 Ohio St.3d 729, 730, 590 N.E.2d 1257 (1992), citing *Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) and *State ex rel. Seigler v. Rone*, 42 Ohio St.2d 361, 361-362, 328 N.E.2d 811 (1975).

{¶ 188} In the case before us, there has been no contention that the transcript filed in the court of appeals was unnecessary for resolution of the appeal. In a prior case, the Supreme Court of Ohio had held:

> "*Griffin v. Illinois*, and its progeny establish the principle that the State must, as a matter of equal protection, provide indigent prisoners with the basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners. While the outer limits of that principle are not clear, there can be no doubt that the State must provide an indigent defendant with a transcript of prior proceedings when that transcript is needed for an effective defense or appeal." *Britt v. North Carolina* (1971), 404 U.S. 226, 227, 92 S.Ct. 431, 433, 30 L.Ed.2d 400. *See also, State v. Arrington* (1975), 42 Ohio St.2d 114, 116, 326 N.E.2d 667.

*State ex rel. Ralston v. Hill*, 65 Ohio St.2d 58, 59, 417 N.E.2d 1380 (1981). The court concluded, however that the trial court had fulfilled its duty by providing the transcript for appeal and was not required to furnish a second free copy to the defendant. *Id.* *See also State ex rel. Call v. Zimmers*, 85 Ohio St.3d 367, 368, 708 N.E.2d 711 (1999) ("Only one copy of a transcript of a criminal trial need be provided to an indigent criminal

defendant.").

{¶ 189} Despite the fact that the State is not required to furnish a second free copy, we ordered the transcript to be furnished to the Ohio Public Defender at the State's expense. The subsequent inclusion of a fee in the cost bill is inconsistent with our order. However, as noted, a defendant is only entitled to one free transcript.

{¶ 190} R.C. 2301.20 provides that "[a]ll civil and criminal actions in the court of common pleas shall be recorded." R.C. 2301.23 further states that "[w]hen notes have been taken or an electronic recording has been made in a case as provided in section 2301.20 of the Revised Code, if the court or either party to the suit requests written transcripts of any portion of the proceeding, the reporter reporting the case shall make full and accurate transcripts of the notes or electronic recording."

{¶ 191} In such situations, R.C. 2301.24 provides that:

The compensation of reporters for making written transcripts as provided in section 2301.23 of the Revised Code shall be fixed by the court of common pleas of the county in which the trial is held. If more than one transcript of the same testimony or proceeding is ordered, *the reporter shall make copies of the transcript at cost* pursuant to division (B)(1) of section 149.43 of the Revised Code or shall provide an electronic copy of the transcript free of charge. The compensation shall be paid by the party for whose benefit a transcript is made. The compensation for transcripts requested by the prosecuting attorney or an indigent defendant in criminal cases or by the trial judge in either civil or criminal cases, and for copies of decisions and charges furnished by direction of the court shall be paid from

the county treasury and taxed and collected as costs.

(Emphasis added.)

{¶ 192} The Supreme Court of Ohio has said that "when a party to a case requests copies of a court transcript of the proceedings in that action, R.C. 149.43 is superseded by R.C. 2301.24, and the party must pay the official court reporter the fees designated by the court pursuant to the latter statute." *State ex rel. Slagle v. Rogers*, 103 Ohio St.3d 89, 2004-Ohio-4354, 814 N.E.2d 55, ¶ 18. *Accord State ex rel. Newsome v. Hack*, 159 Ohio St.3d 44, 2020-Ohio-336, __ N.E.3d __, ¶ 7,

{¶ 193} Thus, by statute, Nicholas was required to pay for the transcript that the Ohio Public Defender obtained on his behalf, and the trial court did not err in including that amount in the cost bill. In deciding what the term "at cost" in R.C. 149(B)(1) means, the court stated in *Slagle* that it is "the actual cost of making copies, 'unless the cost is otherwise set by statute.' " *Id*. at ¶ 6, quoting *State ex rel. Warren Newspapers, Inc. v. Hutson*, 70 Ohio St.3d 619, 625, 640 N.E.2d 174 (1994). The court decided that "R.C. 2301.24 is a specific statute that governs the compensation to be paid shorthand reporters when a party to an action requests copies of transcripts." *Id*. at ¶ 7. As a result, the court held that R.C. 2301.24 and the local fees set by the court of common pleas would control. *Id*. at ¶ 8-15,

{¶ 194} In the case before us, the local rules of court set the total fee for an original plus a certified copy of a transcript for indigent defendants at $4.00 per page. The cost for a non-indigent or civil party for an original plus a certified copy is $5.25 per page. For transcription from an audio tape, the cost is $7.50 per page for an original plus a certified copy, with no discount for indigent defendants. A copy in written format is $.10 per page,

and an electronic copy is free. *See* Champaign County Court of Common Pleas Local Rules, Appendix B – Transcript Rate Policy, p. 2. Presumably, the reduced cost of indigent transcripts is based on the requirement of providing one free transcript for appeals.

{¶ 195} As we mentioned, the total amount of the fee charged to Nicholas was $8,466.50. That amount divided by four (rounding down) would represent about 2,116 transcribed pages.[15] It is not the business of this court to count every page from proceedings in the trial and juvenile courts that have been transcribed, and we note that the arguments of both sides in connection with this assignment of error have not been helpful. In any event, the three volumes of the trial transcript and the transcript of the amenability hearing alone account for around 1,000 pages. There are numerous other hearing transcripts as well, including a fairly lengthy hearing on the motion in limine.

{¶ 196} From the record, we cannot tell whether the trial court also charged Nicholas for the State's copies, or if any additional copies were ordered that were added to the $8,466.50 charge. This appears unlikely, given the length of the transcripts we mentioned. However, since the case is being remanded for correction of the cost bill on appointed counsel fees and the amounts owed for State responses, the trial court should clarify whether the assessed fee includes the State's copies and whether the copies were made from audio tapes or otherwise. Furthermore, charging Nicholas for the State's copies, if any were made, would be inappropriate, since, like Nicholas, the State could have simply chosen to read the original transcript that was filed with our court, without

---

[15] It is unclear whether any of the proceedings were transcribed from audio tapes. For purposes of explanation, we are using the $4.00 per page for indigent transcription.

ordering and paying for a copy. Likewise, the court should not charge Nicholas for the original transcript filed in the court of appeals, as indigent defendants are entitled to a free transcript for purposes of direct appeal.

{¶ 197} Based on the preceding discussion, the Fifth Assignment of Error is overruled in part and is sustained in part. This matter will be remanded for correction of the cost bill as it pertains to the appointed counsel fees, clarification of the amounts charged for the State's responses, and clarification of the amount attributable to the copy of the proceedings that was provided to the Ohio Public Defender.

## VII. Conclusion

{¶ 198} Nicholas's First, Second, Third, and Fourth Assignments of Error are overruled, and the Fifth Assignment of Error is overruled in part and sustained in part. Accordingly, the judgment of the trial court is affirmed in part and reversed in part, and this cause is remanded to the trial court solely for the purposes of correcting the cost bill concerning appointed counsel fees, clarifying the amount of the cost bill attributable to the responses to Nicholas's motions, and clarifying the charges for copies of transcripts provided to the Ohio Public Defender.

. . . . . . . . . . . . .

HALL, J., concurs.

DONOVAN, J., dissents:

{¶ 199} I dissent. The rights of a mentally-ill child should not be denied because of a lack of government "resources." The availability of resources has absolutely nothing

to do with an individual assessment of blameworthiness, maturity and amenability. The overarching interest in an amenability determination is the welfare of the child, and the decision to throw away a child should not be dependent on the fiscal welfare of the state. The trial court relied upon faulty logic and a lack of evidence when it concluded ODYS did "not have the resources or capability of treating [DID], which requires a long term intensive treatment plan that *may require 24 hours/7 day supervision and support."* (Emphasis added.) This finding was not supported by the totality of the record and is fundamentally at odds with the goals of the juvenile justice system and the tenets of due process and equal protection, especially as they pertain to a mentally-ill child.

{¶ 200} Transferring a 15-year-old mentally-ill child such as Nicholas (5 ft. 3 in., 102 lbs, who was 14 at the time of the offense), who has absolutely no juvenile history of delinquency and no previous mental health intervention, after years of cutting behavior, should be a last resort. "People with mental illness have been mistreated and misunderstood throughout human history." Cusack, *Kent Make Up Their Minds: Juvenile Mental Illness and the Need for Continued Implementation of Therapeutic Justice Within the Juvenile Justice and Criminal Justice Systems*, 22 Am.U.J. Gender Soc. Pol'y & L. 149, 158 (2013).

{¶ 201} It is important to note that this Court addressed the "general differences between juveniles and adults" in *State v. Anderson,* 2d Dist. Montgomery No. 25689, 2014-Ohio-4245, ¶ 29-30, which relied on *Roper v. Simmona*, 543 U.S. 551, 569, 125 S.Ct. 1183, 161 L.E.2d 1 (2005), as follows:

> * * * These included the fact that " '[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than

in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions.' " [*Roper* ar 569], quoting *Johnson v. Texas,* 509 U.S. 350, 367, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993). The court further noted that "[t]he second area of difference is that juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *Id.,* citing *Eddings v. Oklahoma,* 455 U.S. 104, 115, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

Finally the court observed that "[t]he third broad difference is that the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed." *Id.* at 570, citing E. Erikson, *Identity: Youth and Crisis* (1968). With regard to the three general differences, the court stressed that:

> These differences render suspect any conclusion that a juvenile falls among the worse offenders. The susceptibility of juveniles to immature and irresponsible behavior means "their irresponsible conduct is not as morally reprehensible as that of an adult." *Thompson [v. Oklahoma], supra,* [487 U.S. 815] at 835, 108 S.Ct. 2687 * * * (plurality opinion). Their own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. The reality that juveniles still struggle to define their identity

means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed. Indeed, "[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside."

*Johnson, supra,* at 368, 113 S.Ct. 2658 * * *.

(Citation omitted.) *Roper,* 543 U.S. at 570, 125 S.Ct. 1183, 161 L.Ed.2d 1.

**{¶ 202}** Notably, the clinical definition of mental illness shares features with juveniles ultimately bearing upon culpability.

The State, through its juvenile courts, must demonstrate that it is *conscientiously* striving to achieve the rehabilitation it promises, and that (though it makes no promises to actually bring about the reformation of the child) it will seek to employ the best institutional, probationary, medical, **psychiatric** and other techniques in providing an opportunity for each child to develop into a mature and law abiding citizen.

(Emphasis added.) Ketcham, *The Unfulfilled Promise of The Juvenile Courts,* 7 Crime and Delinquency 97, 101 (1961).

**{¶ 203}** This was unquestionably a heinous offense, but the record simply does not support a lack of amenability. Dr. Hrinko, the GAL, and Book, the ODYS

representative, all testified favorably to Nicholas. We should not lose sight of the fact that transfer to adult court is a grave step, and since the State bears the burden of production of evidence for transfer, it necessarily fails where the totality of the evidence supports retention in juvenile court. Indeed, Nicholas's noted intelligence and maturity would not stand in the way of rehabilitation, rather these attributes would facilitate it.

{¶ 204} Although a trial court may consider the nature of the offense, this does not end the inquiry. It must still be determined if the court soundly exercised its discretion. The "facts relating to the offense are to be considered only to the extent relevant to the child's physical or **mental condition,** and the Staff Notes [to Juv.R. 30] warn of the prejudice that a particularly heinous crime could cause the court." (Emphasis added.) *In re Snitzky,* 73 Ohio Misc.2d 52, 60, 657 N.E.2d 1379 (C.P.1995).

{¶ 205} Regarding R.C. 2152.12(B)(3), in *West,* 167 Ohio App.3d 598, 2006-Ohio-3518, 856 N.E.2d 285, ¶ 61-63, 65 (McFarland, J., dissenting), the dissenting judge noted:

This standard [of proof required for a discretionary bindover] seems to suggest a balancing test akin to a mere preponderance-of-the-evidence standard, or a more-likely or more-than-probable-standard.

While some have concluded that substantial evidence is required, others adopt a clear-and-convincing standard. Still others claim that because a discretionary bindover is an "adjudicatory hearing," a standard of proof beyond a reasonable doubt is required.

While a higher standard may seem more appropriate than a mere balancing test, regardless of the standard of proof used by the trial court, it is axiomatic that the burden of production should lie with the state of Ohio.

Or, stated differently, because it is the state's motion seeking transfer to the adult system, it is inappropriate to place the burden on the juvenile as to his amenability. It is the state's duty to present sufficient evidence to show that the child is now not amenable to "care and rehabilitation" within the juvenile justice system.

(Footnotes omitted.)

{¶ 206} The State did not produce sufficient evidence herein to support bindover. Quite simply, Hrinko, Book and the GAL all provided testimony favorable to Nicholas. The State did not produce any substantive evidence to rebut the opinions and assertions of Hrinko, Book and the GAL. "The most important point of the *Kent* decision is that the discretion vested in the juvenile court is not a license to be arbitrary." *In re Snitzky* at 57, citing *Kent*, 383 U.S. 541, 562, 86 S.Ct. 1045, 16 L.Ed.2d 84. In addition, in my view the trial judge displayed an attitude of bias against Book and ODYS as evidenced by the following exchange:

THE COURT: Would it surprise you to know that the ODYS has ignored Court orders from this Court in the past?

* * *

BOOK: It would. It wouldn't be my understanding that this is the typical way of handling a Court order.

{¶ 207} The "beef" that the trial court had with ODYS should not have been held against Nicholas or used as a criticism of Book. Book's testimony clearly established that ODYS had a licensed psychologist on staff at each of the three facilities in Ohio, who could "provide assessments and screenings" and a variety of testing as well as

"intervention in terms of individual and group therapy."

{¶ 208} Moreover, ODYS has broad authority to

[r]eceive custody of all children committed to it under Chapter 2152

of the Revised Code, cause a study to be made of those children, and issue

any orders, as it considers best suited to the needs of any of those children

and the interests of the public, for the treatment of each of those children.

R.C. 5139.04.

{¶ 209} Turning to the highly relevant testimony of Book, the Acting Chief of Behavioral Health Services at ODYS, she testified that there were 7 licensed psychologists, a psychology supervisor, and "a number of psych assistants who work underneath that person's license and they do testing." She testified that ODYS would provide a juvenile with DID "a mental health appraisal or diagnostic assessment" within 14 days of admission to develop an individual treatment plan. Book testified that the process of assessment was "complex" and thorough. Although Book had only been in her position for a month, she had been employed with ODYS since October 2016. Notably, she was only able to access a three-year window to search for other juveniles treated for DID in ODYS, not review decades of files.

{¶ 210} Furthermore, ODYS was not the solitary option for Nicholas, as Twin Valley and Mary Haven were referenced by the GAL and Book as possible placements. Chapter 2152 of the Ohio Revised Code allows for several different dispositional alternatives, which include public and private institutions, intense probation and local detention up to and including a retention of the child, and potential blended sentence as a serious youth offender (SYO).

{¶ 211} In fact, the evidence adduced established that Nicholas responded well to a structured, supportive environment (of six months duration) during his prehearing detention evaluations and, as Dr. Hrinko noted, Nicholas's potential for learning to manage his behavior/mental illness appropriately would likely increase with ongoing supervision and guidance.   The specter of an equal protection violation is also present herein as the psychiatrist at Ohio State cancelled Nicholas's evaluation due to a lack of insurance. It is disturbing and potentially a violation of equal protection and due process to deprive an indigent child of access to proper psychiatric evaluation/care, including prescription medication.   At a minimum, we must require the juvenile court judge to assess the possible rehabilitation of a child by use of procedures (including psychiatric evaluations at the State's expense, when needed), medications, services and facilities currently available to the court in the State of Ohio.

{¶ 212} Although the majority suggests a blended sentence is not a consideration in the amenability determination, this ignores the imperative that transferring a child to an adult court should be a last resort. Blended sentencing provides "a middle ground between the grave sanctions of adult court and the limited jurisdiction of juvenile court." Albaugh & Wamstad, *Striking a Fair Balance: Extended Juvenile Jurisdiction in North Dakota*, 88 N.D.L.Rev. 139, 158 (2012).   "This blended sentencing option 'provide[s] a viable dispositional option for juvenile court judges facing juveniles who have committed serious offenses and gives juveniles one last chance at success in the juvenile system with the threat of adult sanctions as disincentive.' "   (Citation omitted.) *Id.* at 154-55.   Of course, for Nicholas, this would be both his first and last chance.   Nicholas did not have any demonstrated failure to respond to treatment, as none was ever undertaken.

Notably, even absent psychiatric care, his six month pre-transfer stay at OCYC was uneventful and wholly non-violent. Thus, Nicholas had demonstrated a favorable reaction to supervision in a secure environment.

{¶ 213} The juvenile judge had this blended sentencing tool in her arsenal if she denied transfer. At a minimum, she should have considered it as requested in a motion filed by Nicholas's counsel. It would have given her the power to sentence Nicholas conditionally, first as a juvenile and later as an adult, depending upon whether subsequent review indicated that adult sentencing was warranted. With blended sentencing, the court could have taken advantage of lock-down facilities and therapeutic and rehabilitation services which are uniquely available for a child. The court could have observed how Nicholas performed until the age of 21. Upon his majority, the court would then have had a record of treatment and performance upon which to base a more informed, predictive decision about the possibility for success versus risk to society. Blended sentencing affords an opportunity for redemption while retaining institutional control over the juvenile for the protection of society, which can be a win-win proposition. Such an option is not solely at the State's discretion, as an adjudication of responsibility for this charge mandates such a disposition.

{¶ 214} Turning to the testimony not noted by the majority, the following evidence should have been appropriately noted, beginning with salient testimony from Dr. Hrinko. Every line of proof must be considered together, not separately. Even if each thread of proof taken by itself were of insufficient probative force, the conclusion does not necessarily follow that the proof taken as a whole was insufficient. The threads of proof in this case were interwoven and supported each other.

{¶ 215} Dr. Hrinko noted that Nicholas exhibited 4 of the 5 symptoms of DID and that he did not exhibit recurrent gaps in memory, which was "actually a good thing, because he knows Jeff exists. Therefore [Nicholas] is willing to work hard to help Jeff go away." Dr. Hrinko noted that once a person reaches the stage where he "block[s] any awareness of the alternative personality and [has] those memory gaps then treatment is harder."

{¶ 216} Dr. Hrinko testified that DID is rooted in an inability to handle stress and that research shows that intensive treatment can achieve results in as little as one year. He testified that the length of time required for treatment would depend on the nature of the program and the individual. Hrinko unequivocally testified that, based upon Nicholas's young age and the time available for treatment in the juvenile system, Nicholas's mental illness was treatable; this testimony was not rebutted by other expert testimony. Dr. Hrinko also testified that Nicholas would need to see a psychologist on a weekly basis, *not a 24-hour basis*, and that a controlled environment would provide opportunities to use the skills he developed in therapy. Dr. Hrinko testified that Nicholas would also need personnel available "so if he was in an environment where he was having conflict * * * [he would] be able to say, I need to go talk to my doctor," and they could reach *somebody* to talk it through.   Notably Book testified that psychiatric services are available "as needed" at ODYS and that juveniles receive the services they need.

{¶ 217} Dr. Hrinko did not testify that Nicholas needed to be under the constant supervision of a psychologist 24 hours a day/seven days a week. This suggestion was merely imbedded in a question asked by the State. The prosecutor's questions were not evidence. Significantly, the record establishes that juvenile facilities do provide round-the-

clock secure confinement. Furthermore, Hrinko testified that it was his reasonable professional judgment that it was "possible and likely" that Nicholas would be able to be reintegrated into society. He testified that a one-year program generally seems to be helpful. Hrinko also testified that, if Nicholas "participates in treatment consistent with what the research suggests is effective and is able to reintegrate Jeff into himself to where Jeff no longer existed, the odds of Nicholas re-offending would be approximately the same as other people his age walking the street." As the dissenting opinion in *West* noted, "any juvenile court can order a child to comply with whatever treatment it deems appropriate," despite this juvenile court judge's obvious cynicism regarding ODYS following her orders. *See West*, 167 Ohio App.3d 598, 2006-Ohio-3518, 856 N.E.2d 285, ¶ 72 (McFarland, J., dissenting). . Nevertheless, the question before this Court is not whether ODYS is adequately serving the needs of the public and the juveniles in its care. It is whether the juvenile court applied clearly established law or acted contrary to that law, or based its decision on an unreasonable determination of the facts in light of the evidence presented.

{¶ 218} Furthermore, the GAL report indicated that a juvenile in the juvenile court system is not necessarily precluded from acceptance at Twin Valley Behavioral Health Hospital, and that Twin Valley Behavior Health representatives would respond to a juvenile facility to determine if hospital admission was necessary in the event Nicholas needed emergency care while in the juvenile system. The GAL's report was highly relevant and is not referenced in the majority opinion. Hence, I include it here:

> I spoke to David Foreman at Twin Valley Behavior Health Hospital
> August 10, 2017. He stated that all juveniles the hospital has accepted in

the past have already been bound over to adult Court. However, a juvenile still in the Juvenile Court system is not necessarily precluded from acceptance.

According to Mr. Foreman, the proper course of action is for COYC to contact Twin Valley if Donovan [Nicholas] has an episode. Their representatives then would report to the facility to determine whether admission to the Hospital is necessary. Dr. Foreman stated that [Nicholas's] mental health concerns would need to be emergent rather than urgent. If the episode already had resolved and Donovan no longer were in distress, the Hospital likely would not accept him.

* * *

I have reviewed Incident Reports from COYC throughout the pendency of the case. Per the April 10th Report, Donovan was placed on suicide precaution April 6, 2017. He disclosed from the beginning of his detention that "Jeff" existed and is the voice in his head that tells Donovan what to do.

The April 12th Report stated that Donovan was upset with "Jeff" for talking about the incident because that forced Donovan to think about it. His coping skills included sleeping and putting his head down.

May 6th was the first Report of "Jeff" making an appearance since Donovan entered COYC. Officer Ropp was in the dining room and noticed that Donovan had written a series of dots on a piece of paper. When he asked Donovan about it, Donovan became visibly upset and stated that "Oh

Jeff is so mad right now . . . because I let him get caught while he was out." Donovan was instructed to alert staff when "Jeff" appeared and went to bed with no further incident.

On May 12th, Donovan participated in a suicide risk assessment. Donovan then stated that "Jeff" had appeared earlier in the day, and that he is "starting to come out more." The CYOC Clinician was concerned, and Maryhaven was contacted. They did not have an available representative at the time and, by the time they did arrive, the incident had ceased.

On July 24th, Donovan reported that he had homicidal ideations two times that day. He stated an increase in depression and in thoughts of aggression and feeling triggered.

On July 31st, Donovan reported that "Jeff" was "out." At that time, he was concerned about whether he would be in trouble if he admitted that "Jeff" made an appearance.

On August 7th, Donovan stated that he had not experienced any homicidal ideations for more than one week. He reported a better mood, though symptoms of depression still were present.

Donovan's counsel stated that Father was attempting to schedule an appointment for Donovan with a psychiatrist to address his mental health needs. However, to date, Donovan has not attended any appointments.

At this time, I believe it is in Donovan's best interests for his case to remain in the Juvenile Court. I base this recommendation on both evaluations from Dr. Hrinko, **as well as on my own interactions with**

**Donovan**. Dr. Hrinko stated to me that there is a prescribed course of treatment for [DID], and that Donovan could be successful in his treatment while in the Juvenile Court system.

(Emphasis added.)

{¶ 219} While it is well-settled that a "juvenile court * * * is not bound by expert opinion, and may assign any weight to expert opinion that it deems appropriate," *West,*167 Ohio App.3d 598, 2006-Ohio-3518, 856 N.E.2d 285, at ¶ 30, I would conclude that the juvenile court herein actually mischaracterized Hrinko's and Book's testimony regarding Nicholas's treatment needs and the ability of the juvenile system to meet those needs. In other words, the court's conclusion that ODYS "does not have the resources or capability of treating [DID], which requires a long-term intensive treatment plan that may require 24 hours/7-day supervision and support," was not supported by the record. This finding was not premised upon facts established at the hearing and was speculative. Furthermore, it ignored the availability of other institutions/resources, both public and private, within the community and/or State which are not operated by ODYS.

{¶ 220} This case raises disturbing questions about a juvenile system that cannot or will not handle children charged with the most serious crimes.   The fickle judicial mind fails to consider that Nicholas's "transient rashness, proclivity for risk and inability to asses consequences – both lessen a child's 'moral culpability' " and "enhance the prospect that as the years go by and neurological development occurs his  'deficiencies will be reformed.' " *Miller,* 567 U.S. at 472, 132 S.Ct. 2455, 183 L.Ed.2d 407, quoting *Graham v. Florida,* 560 U.S. 48, 68, 130 S.Ct. 2011, 176 L.Ed.2d 825, quoting *Roper,* 543 U.S. at 570, 125 S.Ct. 1183, 161 L.Ed.2d 1.

**{¶ 221}** Accordingly, I would reverse the conviction based upon an improper bindover to adult court. A remand to the juvenile court is warranted.

Copies sent to:

Jane A. Napier
Timothy B. Hackett
Hon. Nick A. Selvaggio